No. 25-1745

# In the United States Court of Appeals for the Fourth Circuit

VAPOR TECHNOLOGY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants*,

v.

MCKINLEY WOOTEN, JR., *et al.*,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the Eastern District of North Carolina

**BRIEF OF PLAINTIFFS-APPELLANTS**

Eric N. Heyer
James C. Fraser
Anna Stressenger
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C.  20036
Phone: 202.331.8800
Fax:  202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Nos. 25-1745

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the undersigned counsel of record certifies as follows:

Plaintiff-Appellant Vapor Technology Association is a trade association, which has no member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity.

Plaintiff-Appellant Bright Leaf Vendors, Inc. has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Plaintiff-Appellant Wages and White Lion Investments, LLC (d/b/a Triton Distribution) has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

A majority stake in Plaintiff-Appellant AMV Holdings, LLC is owned by AMV, LLC, a majority stake in which is owned, in turn, by VTM-MV, LLC, a majority stake in which is owned, in turn, by VTM Holdings, LLC, a majority stake in which is owned, in turn, by VTM Acquisition, LLC, a majority stake in which is owned by Panorama Point Partnership, LP. AMV, LLC is also partially owned by Alohma Holdings, LLC and VTM Holdings, LLC is also partially owned by Vapor Management, LLC. No publicly held corporation owns 10 percent or more of the stock of any of the aforementioned companies.

ii

Plaintiff-Appellant Reagan Murphy is a natural person.

There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of this case.


            /s/ Eric N. Heyer
Eric N. Heyer

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUES ...........................................................................4

STATEMENT OF THE CASE................................................................................4

I.      ENDS products are a less harmful alternative to traditional cigarettes that the FDA regulates under the FDCA. .........................................4

II.     The FDA has rejected Big Tobacco's attempts to change its enforcement discretion policy for ENDS lacking marketing authorization ..................................................................9

II.     The North Carolina Legislature adopted Big Tobacco's proposed enforcement policy for unauthorized ENDS. ...................................11

III.    S.L. 2024-31 threatens the continued existence of the retailer Appellants' businesses and prevents the consumer Appellant from using the ENDS products she prefers ...................................13

IV.     Procedural history..................................................................................14

SUMMARY OF ARGUMENT...........................................................................16

STANDARD OF REVIEW .................................................................................17

ARGUMENT .......................................................................................................19

I.      Appellants are likely to succeed on the merits of their claim that 21 U.S.C. § 337(a) impliedly preempts North Carolina Session Law 2024-31's directory-related restrictions.........................................19

        A.      The text and structure of the FDCA, including the Act's tobacco provisions, show that Congress intended section 337(a) to apply to tobacco products. ...............................................25

        B.      When it enacted the TCA, Congress understood from *Buckman* and its progeny that section 337(a) could impliedly preempt state law

duties if the "existence of" the TCA was a "critical element" of those duties ....................................................................................28

C.    In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a)................................30

    1.    The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a)......................30

    2.    The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products...............................32

    3.    The district court's interpretation of section 387p would allow a State to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity .......................................34

D.    The district court's interpretation would tolerate state law requirements that actually conflict with federal requirements, violating the Supreme Court's command that preservation and savings clauses do not bar the ordinary working of conflict preemption principles ...........................................................................38

E.    Even examining section 387p in isolation, S.L. 2024-31 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i)......................................44

II.    The NCDOR's threatened enforcement of S.L. 2024-31 irreparably harms Appellants.....................................................46

III.    The balance of harms and public interest favor enjoining enforcement of S.L. 2024-31 ..................................................................48

CONCLUSION...............................................................................................50

REQUEST FOR ORAL ARGUMENT..............................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramski v. United States*,
573 U.S. 169 ..................................................................................25, 39

*Air Evac EMS, Inc. v. Dodrill*,
548 F. Supp. 3d 580 (S.D. W.Va. 2021)...............................................48

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) ...................................................................18

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)...............................................................................47

*American Telephone & Telegraph Co. v. Central Office Telephone,
Inc.*, 524 U.S. 214 (1998)......................................................................40

*Andrews v. Conrail*,
831 F.2d 678 (7th Cir. 1987) .................................................................20

*Arizona Dream Act Coalition v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...............................................................49

*Arizona v. United States*,
567 U.S. 387 (2012)...........................................................................39, 44

*Ayes v. U.S. Dep't of Veterans Affairs*,
475 F.3d 104 (4th Cir. 2006) .................................................................25

*Baker v. Bethlehem Steel Corp.*,
24 F.3d 632 (4th Cir. 1994) ...................................................................37

*Bank One, N.A. v. Gattau*,
190 F.3d 844 (8th Cir. 1999) .................................................................49

*Bowe Bell & Howell Co. v. Harris*,
145 Fed. Appx. 401 (4th Cir. 2005)......................................................48

*Bryant v. Medtronic, Inc.*,
623 F.3d 1200 (8th Cir. 2010) ...............................................................22

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001) .................................................... 8, 16, 20-22, 29, 30

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979) ....................................................................28

*Centro Tepeyac v. Montgomery Cty.*,
  722 F.3d 184 (4th Cir. 2013) .........................................................18

*Re: Complaint Filed by R.J. Reynolds Tobacco Co. and R.J. Reynolds
  Vapor Co. Concerning Certain Disposable Vaporizer Devices &
  Components & Packaging Thereof*,
  Inv. No. 337-TA-1381, 2023 WL 11932250
  (U.S. Intern. Trade Com'n Dec. 15, 2023) ..................................10, 11

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ....................................................................20

*dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119 (4th Cir. 2022)........................18

*Farina v. Nokia, Inc.*,
  625 F.3d 97 (3d Cir. 2010) ............................................................41

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995).....................................................................20

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000).......................................... 16, 30, 39, 40, 42, 44

*Grand River Enters. Six Nations v. Knudsen*,
  No. 23-35494, 2024 WL 2992503 (9th Cir. Jun. 14, 2024) ..............................23

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982).....................................................................39

*Heckler v. Chaney*,
  470 U.S. 821 (1985)....................................................................8, 20

*Heuer v. United States Secretary of State*,
  20 F.3d 424 (11th Cir. 1994) .........................................................39

*Hines v. Davidowitz*,
  312 U.S. 52 (1941).....................................................................20, 39

vii

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Rev.*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 85732 (S.D. Iowa May 2, 2025) ...............................................................15

*In re Irby*,
858 F.3d 231 (4th Cir. 2017) ...............................................................39

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ...............................................................49

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ...............................................................19

*Loreto v. Proctor & Gamble Co.*,
515 Fed. Appx. 576 (6th Cir. 2013)...............................................................22

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990)...............................................................28

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ...............................................................18

*Motor Coach Employees* v. *Lockridge*,
403 U.S. 274, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971) ...............................................................43

*Mylan Labs, Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) ...............................................................8, 20

*Nathan Kimmel v. DowElanco*,
275 F.3d 1199 (9th Cir. 2002) ...............................................................29

*Newsom v. Albemarle Cty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) ...............................................................19

*Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.*,
48 F.4th 1040 (9th Cir. 2022) ...............................................................8, 22

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................48

*Novo Nordisk Inc. v. Live Well Drugstore, LLC*,
No. 23-cv-808, 2025 U.S. Dist. LEXIS 17792 (M.D. Fla. Jan. 30, 2025)...............................................................23

*Psinet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ...............................................................36

*Regan v. Sioux Honey Ass'n Coop.*,
  921 F. Supp. 2d 938 (E.D. Wis. 2013) ................................................23

*Rum Creek Coal Sales, Inc. v. Caperton*,
  926 F.2d 353 (4th Cir. 1991) ...............................................................48

*Scanlon v. Medtronic Sofamor Danek USA, Inc.*,
  61 F. Supp. 3d 403 (D. Del. 2014).......................................................32

*Sierra Club v. United States Army Corps of Eng'rs*,
  909 F.3d 635 (4th Cir. 2018) ...............................................................25

*South Carolina v. Catawba Indian Tribe*,
  476 U.S. 498 (1986).............................................................................33

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002)...............................................................................41

*Tafas v. Dudas*,
  511 F. Supp. 2d 652 (E.D. Va. 2007) ..................................................48

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ...............................................................47

*U.S. v. Locke*,
  529 U.S. 89 (2000)...............................................................................44

*United States v. Iowa*,
  126 F.4th 1334 (8th Cir. 2025) ............................................................42

*United States v. Lit Drug Co.*,
  333 F. Supp. 990 (D.N.J. 1971).............................................................5

*United States v. Menasche*,
  348 U.S. 528 (1955).............................................................................33

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ...............................................................18

ix

*United States v. Walsh*,
331 U.S. 432 (1947).................................................................37

*United States v. Wayda*,
966 F.3d 294 (4th Cir. 2020) ...................................................37

*Vapor Tech. Ass'n v. FDA*,
977 F.3d 496 (6th Cir. 2020) .....................................................6

*Vitkus v. Blinken*,
79 F.4th 352 (4th Cir. 2023).....................................................19

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008).....................................................................18

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)..................................................47

*Wyeth v. Levine*,
555 U.S. 555 (2009)..................................................................25

## Statutes and Constitutional Provisions

U.S. Const., art. VI, cl. 2.................................................................20

21 U.S.C. § 321 ...............................................................................6

21 U.S.C. § 331 ................................................... 1, 5, 21, 25, 34-36, 45

21 U.S.C. § 332 ......................................................................... 34-36

21 U.S.C. § 333 ...............................................................25, 34, 35 36

21 U.S.C. § 334 ...............................................................25, 34, 35, 36

21 U.S.C. § 337 .........................................................................1, 8, 27

21 U.S.C. § 346a ..............................................................................26, 31

21 U.S.C. § 350e ...............................................................................26

21 U.S.C. § 350g...............................................................................26

x

21 U.S.C. § 351 ................................................................................4

21 U.S.C. § 360 ..............................................................................21

21 U.S.C. § 360k ............................................................................26

21 U.S.C. § 364j ........................................................................26, 28

21 U.S.C. § 379aa .....................................................................26, 28

21 U.S.C. § 379aa-1 ............................................................26, 28, 31

21 U.S.C. § 379r ............................................................................26

21 U.S.C. § 379s ......................................................................26, 28

21 U.S.C. § 387a ..............................................................................5

21 U.S.C. § 387b .........................................................1, 6, 26, 35, 36

21 U.S.C. § 387c ............................................................................34

21 U.S.C. § 387e ............................................................................34

21 U.S.C. § 387j .......................................................................1, 2, 6

21 U.S.C. § 387p .............................................................3, 28, 30, 31

21 U.S.C. § 387s ............................................................................35

28 U.S.C. § 1292 ..........................................................................3, 4

Consolidated Appropriations Act, 2022,
   Pub. L. 117-103, 136 Stat. 49 (2022) ....................................6

Food, Drug, and Cosmetic Act,
   Pub. L. No. 75-717, 52 Stat. 1040 (1938) ........................ 4, 25-27

Nutrition Labeling and Education Act,
   Pub. L. 101-535, 104 Stat. 2353 (1990) ................................27

Tobacco Control Act, 123 Stat. 1776 (2009) ..................5, 6, 30, 31, 40

N.C. Gen. Stat. § 14-313 ..........................................................12, 13, 43

xi

N.C. Gen. Stat. § 75-8 ............................................................................13, 43

N.C. Gen. Stat. § 75-15.2 .......................................................................13, 43

N.C. Gen. Stat. § 75-16 ..........................................................................12, 43

N.C. Gen. Stat. § 75-16.1 .......................................................................12, 43

N.C. Gen. Stat. § 143B-245.11 ..............................................................12, 45

N.C. Gen. Stat. § 143B-245.12 ....................................................................11

N.C. Gen. Stat. § 143B-245.13 ....................................................................12

**Regulations**

21 C.F.R. § 210 ...............................................................................................4

21 C.F.R. § 211 ...............................................................................................4

21 C.F.R. § 820 ...............................................................................................4

**Other Authorities**

*Deeming Tobacco Products To Be Subject to the Federal Food, Drug,*
*and Cosmetic Act, as Amended by the Family Smoking Prevention*
*and Tobacco Control Act; Restrictions on the Sale and*
*Distribution of Tobacco Products and Required Warning*
*Statements for Tobacco Products,*
*81 Fed. Reg. 28,974 (May 10, 2016)* ....................................................... 6

*Supplemental Applications Proposing Labeling Changes for Approved*
*Drugs, Biologics, and Medical Devices*,
73 Fed. Reg. 49603 (Aug. 22, 2008) .........................................................39

Food and Drug Administration Regulatory Procedures Manual,
July 2024, Ch. 4 Advisory Actions, § 4-1-1,
*available at* https://www.fda.gov/media/71878/download ...............................43

H.R. Rep. No. 111-58 (Mar. 2009)........................................................................32

Youth Prevention and Tobacco Harm Reduction Act,
    H.R. 1261 (Mar. 3, 2009)..............................................................................33

## INTRODUCTION

Plaintiff-Appellants Vapor Technology Association, Bright Leaf Vendors, Inc., Wages and White Lion Investments, LLC (d/b/a Triton Distribution) AMV Holdings, LLC (d/b/a Kure CDB and Vape), and Reagan Murphy are retailers, a manufacturer, and a user of electronic nicotine delivery system ("ENDS") products and a trade association whose members manufacture and sell ENDS products. ENDS, also known as electronic cigarettes, are alternatives to traditional cigarettes that are less harmful because they do not contain tobacco, involve combustion, or generate smoke, tar, or ash.

ENDS products are subject to federal regulation by the Food and Drug Administration under the Tobacco Control Act ("TCA"), which is codified as subchapter IX of the Food, Drug, and Cosmetic Act ("FDCA"). Another provision found in subchapter III of the FDCA provides that "all proceedings . . . for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). Among the FDCA's requirements for ENDS is that they are subject to premarket review through the Food and Drug Administration's ("FDA") premarket tobacco product application ("PMTA") process under 21 U.S.C. § 387j. ENDS products sold in interstate commerce without FDA premarket authorization are considered "adulterated" and their sale is prohibited. 21 U.S.C. §§ 387b(6)(A); 331. However, as explained herein, in

weighing Congress's competing objectives in enacting the TCA, FDA exercises enforcement discretion with respect to certain ENDS products and has not required their removal from the market despite their lack of an FDA marketing order.

In 2024, the North Carolina legislature enacted Session Law 2024-31 ("S.L. 2024-31"). S.L. 2024-31 directs the North Carolina Department of Revenue ("NCDOR") to implement a directory of ENDS that may be lawfully sold in the state. S.L. 2024-31 directly cross-references and incorporates 21 U.S.C. § 387j, the premarket review provision of the FDCA for tobacco products. For a particular ENDS product to be eligible for listing on the directory, a manufacturer must be in either partial or full compliance with the FDCA's premarket authorization requirements for that product. Manufacturers and retailers that sell ENDS products not included in the NCDOR directory are subject to civil penalties, seizure of unauthorized products, suspension and/or revocation of their license to sell ENDS, and potential civil suits from competitors for deceptive trade practices, including potential treble damages and attorneys' fees.

The business Appellants sell ENDS products that lack FDA marketing authorization but as to which the FDA is exercising enforcement discretion that, because of the criteria set forth in S.L. 2024-31, cannot qualify for listing on the NCDOR directory. NCDOR announced that it would begin enforcement of S.L. 2024-31 on June 29, 2025. Plaintiffs-Appellants filed a motion to preliminarily

2

enjoin enforcement of S.L. 2024-31, but the district court denied the motion on June 27, 2025, concluding that 21 U.S.C. § 337(a) does not impliedly preempt S.L. 2024-31.

As explained herein, the district court erred as a matter of law. First, contrary to the district court's conclusions, the FDCA's preservation and savings clauses specific to the Act's tobacco authorities, 21 U.S.C. § 387p(a)(1) and (a)(2)(B), do not insulate from a finding of implied preemption a state restriction couched as a "sales" restriction that compels partial or full compliance with another provision of the TCA. Second, where that compelled compliance generates a conflict with the FDA's efforts to strike a balance between competing Congressional objectives in enacting those federal requirements, that state restriction is preempted by 21 U.S.C. § 337(a). Because that is the situation presented by S.L. 2024-31, the district court erred in concluding that Appellants were unlikely to succeed on the merits of their preemption claim. This Court should vacate the district court's order and direct the district court to enter an order preliminarily enjoining enforcement of S.L. 2024-31.

## STATEMENT OF JURISDICTION

Because the district court denied Appellants' motion for a preliminary injunction, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

3

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in holding that North Carolina Session Law 2024-31 is not impliedly preempted by 21 U.S.C. § 337(a) and, as a result, denying Appellants' motion for preliminary injunction.

2.      Whether this Court should direct the district court to enter an order preliminarily enjoining enforcement of North Carolina Session Law 2024-31.

## STATEMENT OF THE CASE

**I.    ENDS products are a less harmful alternative to traditional cigarettes that the FDA regulates under the FDCA.**

Electronic nicotine delivery system products heat a solution containing nicotine into an aerosol that the user inhales. JA 18 ¶ 49. Unlike traditional cigarettes, ENDS do not contain any tobacco leaf, do not rely on combustion, and do not generate smoke. *Id*. The FDA has recognized that ENDS are likely to have fewer and lower concentrations of harmful constituents than traditional cigarettes, with less attendant risk of tobacco-related disease, and that many adults have successfully used ENDS to quit smoking. JA 18-19 at ¶ 50.

Congress enacted the Food, Drug, and Cosmetic Act in 1938 "to prohibit the movement in interstate commerce of adulterated and misbranded food, drugs,

4

[medical] devices, and cosmetics." Pub. L. No. 75-717, 52 Stat. 1040 (1938).[1] In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act, amending the FDCA to prohibit the movement in interstate commerce of certain adulterated and misbranded tobacco products, including traditional (combustible) cigarettes. *See* 21 U.S.C. § 331 (prohibiting the "introduction into interstate commerce of any food, drug, device, *tobacco product*, or cosmetic that is adulterated or misbranded") (emphasis added); 21 U.S.C. § 387a(b) (limiting the FDA's authority over tobacco products to, *inter alia*, cigarettes). One of Congress's stated purposes in enacting the TCA was to reduce serious tobacco-related disease and death—primarily caused by combustible cigarettes. *See* TCA, § 3(9), 123 Stat. 1776, 1782 (2009).[2] Another of Congress's stated purposes was to "provide new and

---

[1] The FDCA defines the terms "adulterated" and "misbranded." 21 U.S.C. § 351(a)(2)(B) & (h), 21 C.F.R. pts. 210, 211, and 820. For example, a drug or medical device is "adulterated" if it is manufactured in a facility that does not fully comply with the FDA's current good manufacturing practice regulations, even if the failure to comply with those regulations has no adverse effect on the product. *United States v. Lit Drug Co.*, 333 F. Supp. 990, 998 (D.N.J. 1971).

[2] Among its findings supporting enactment of the TCA, Congress found that "approximately 8,600,000 Americans have chronic illnesses related to smoking." TCA, § 2(13), 123 Stat. at 1777. Those chronic illnesses include "cancer, heart disease, and other serious adverse health effects." TCA, § 2(2), 123 Stat. at 1777. Congress also found that reducing the use of tobacco by minors by 50 percent would prevent "over 10,000,000 of today's children from becoming regular, daily smokers," would save "over 3,000,000 of them from premature death due to tobacco-induced disease" and that "such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced healthcare costs." TCA, § 2(14), 123 Stat. at 1777. Congress also found that

5

flexible enforcement authority to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782.

In 2016, the FDA adopted a regulation that extended the agency's authority over tobacco products to ENDS products containing tobacco-derived nicotine. *See* 81 Fed. Reg. 28,974 (May 10, 2016). In April 2022, Congress further extended this authority to ENDS products containing non-tobacco-derived nicotine.[3]

When ENDS containing tobacco-derived nicotine became subject to the FDCA in August 2016, they automatically became "adulterated" tobacco products until the manufacturer obtained FDA marketing authorization through the premarket tobacco application ("PMTA") process. 21 U.S.C. §§ 387b(6)(A), 387j(a)(2)(A). The same was true for ENDS containing non-tobacco-derived nicotine in April 2022.

However, there were already many ENDS with tobacco-derived nicotine on the market by August 2016; likewise, there were a very large number of ENDS with non-tobacco-derived nicotine on the market by April 2022. JA 20 ¶ 54. The FDA recognized that immediately forcing all unauthorized ENDS off the market while

---

"because the only known safe alternative to smoking is cessation, interventions should target all smokers to help them quit completely." TCA, § 2(34), 123 Stat. at 1779.

[3] *See* Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, Division P, Title I, Subtitle B, §111(a) (amending the definition of "tobacco product" in 21 U.S.C. § 321(rr)(1) to include products containing nicotine "from any source").

6

manufacturers go through the PMTA process could result in many ENDS users reverting to traditional cigarettes. *See Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 499 (6th Cir. 2020) (noting the FDA's view that removing all unauthorized ENDS from the market too quickly "creates a genuine risk of migration from potentially less harmful [e-cigarette] products back to combustible tobacco products," and that this would be a "public health outcome that should be avoided if at all possible"). Such a result would have been contrary to Congress's directive to reduce the instance of disease and death resulting from the use of traditional tobacco products and to provide flexible enforcement authority to effectively oversee the introduction and promotion of less harmful alternatives. Therefore, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." JA 20 ¶ 56

Since September 2021, the FDA's policy with respect to unauthorized ENDS has been to exercise enforcement discretion on a "case-by-case" basis, citing its authority to do so under the Supreme Court's *Heckler v. Chaney* decision. JA 22 ¶ 57(g); 134-185. In exercising its enforcement discretion, the FDA says it "is continuously evaluating new information and adjusting its enforcement priorities in light of the best available data," and that it "will take appropriate action regarding

7

[ENDS] that are marketed without premarket authorization as warranted based on changed circumstances, new information, or to better address minors' use of those products." *Id*.

Since 1938, the FDCA has always included a provision specifying that *only* the Federal Government can enforce the Act. *See* 21 U.S.C. § 337(a) (stating that "all such proceedings for the enforcement, or to restrain violations, of this [Act] shall be by and in the name of the United States"). Because the FDCA gives the Federal Government the exclusive authority to enforce the Act, the Supreme Court and other federal courts have rejected attempts by other parties to challenge an FDA decision to *not* enforce provisions of the Act. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (stating that the FDCA's enforcement provisions "commit complete discretion to [the FDA] to decide how and when they should be exercised"). And the Supreme Court and other courts, including this Court, have held that 21 U.S.C. § 337(a) impliedly preempts any claim that seeks to directly or indirectly enforce the Act. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001); *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) (dismissing Lanham Act claim against drug manufacturer as impliedly preempted under section 337(a)); *Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) ("The statutory prohibition on private enforcement gives the FDA discretion to temper enforcement or not to enforce in circumstances it deems

8

appropriate. If state law facilitates enforcement beyond what the FDA has deemed appropriate, then state law claims may indeed 'stand as an obstacle' to FDA's enforcement discretion.").

**A.    The FDA has rejected Big Tobacco's attempts to change its enforcement discretion policy for ENDS lacking marketing authorization.**

Evidently unsatisfied with how the FDA has exercised its enforcement authority over ENDS—which compete with their traditional cigarette products—"Big Tobacco" companies like R.J. Reynolds (maker of Camel and Lucky Strike brand cigarettes) and Altria (maker of Marlboro and Virginia Slims brand cigarettes) have encouraged the FDA to deviate from its case-by-case discretionary enforcement policy. JA 17-18 ¶ 46. R.J. Reynolds filed a citizen petition with the FDA in February 2023 requesting that the agency "adopt a new enforcement" policy because the FDA "was not [doing] enough" to prevent underage use of unauthorized ENDS. JA 22 ¶ 58; 187-89. The FDA denied Reynolds' citizen petition in November 2023. JA 23-24 ¶ 62; 200-209. In so doing, the FDA told Reynolds: "[W]e do not agree that FDA has taken insufficient compliance and enforcement action against illegally marketed ENDS products . . . To the contrary, we believe that FDA's comprehensive approach to this matter demonstrates the Agency's robust commitment to implementing and enforcing the law . . . and preventing their access to and promotion of use by youth." *Id*. The FDA also stated that it "is continuously evaluating new information and, in

9

making enforcement decisions, taking into account data on youth use and other risk factors." JA 24 ¶ 63.

While its citizen petition was pending, Reynolds also filed a complaint at the United States International Trade Commission ("ITC") seeking to, *inter alia*, bar the importation of many of the same products that Reynolds asked the FDA to target via its citizen petition.[4] JA 24 ¶ 64.

In response, the FDA sent a letter to the ITC urging it to reject Reynolds' attempt to use the ITC to enforce the FDCA. JA 24 ¶ 65; 95-100. Citing 21 U.S.C. § 337(a), the FDA noted that Congress wants "decisions about the regulatory or compliance status of tobacco products and what products should be prioritized for enforcement [to] reflect the views of the agency charged with administering the FDCA." JA 97. The FDA also noted that 21 U.S.C. § 337(a) reflects congressional intent to have "uniform administration of the FDCA." *Id*.

Based in part on the FDA's letter, the ITC dismissed Reynolds' claim seeking to bar the importation of unauthorized ENDS. *See* Inv. No. 337-TA-1381, 2023 WL 11932250, at *1 (stating "the Commission agrees with FDA"); JA 25 ¶ 66. The ITC reasoned that "it would usurp the FDA's authority to enforce the FDCA and

---

[4] *See Re: Complaint Filed by R.J. Reynolds Tobacco Co. and R.J. Reynolds Vapor Co. Concerning Certain Disposable Vaporizer Devices & Components & Packaging Thereof*, Inv. No. 337-TA-1381, 2023 WL 11932250, at *1 (U.S. Intern. Trade Com'n Dec. 15, 2023).

impermissibly grant a private right of action to enforce the FDCA if the Commission were to institute an investigation based on the Reynolds complaint." 2023 WL 11932250, at *2; JA 25 ¶ 66.

## II.    The North Carolina Legislature adopted Big Tobacco's proposed enforcement policy for unauthorized ENDS.

In July 2024, North Carolina Governor Roy Cooper signed S.L. 2024-31 into law. S.L. 2024-31 directs the North Carolina Department of Revenue to do, in effect, what Reynolds asked the FDA to do via its March 2023 citizen petition and what Reynolds asked the ITC to do via its October 2023 complaint—*i.e.*, take enforcement action against persons selling ENDS that have not been authorized by the FDA unless the product was on the market by August 8, 2016, and the product has a pending PMTA that was filed by September 9, 2020.[5]

S.L. 2024-31 requires NCDOR to establish a directory of ENDS products. N.C. Gen. Stat. § 143B-245.12. For an ENDS product to qualify for the directory, the product's manufacturer must certify that the product either (1) has received "an order granted pursuant to 21 U.S.C. § 387j(c) (marketing granted order) for the vapor

---

[5] While S.L. 2024-31 contains an exception for ENDS that were on the market as of August 8, 2016—the date ENDS containing *tobacco-derived nicotine* became subject to FDCA—S.L. 2024-31 makes no mention of ENDS containing *non-tobacco-derived nicotine* for which PMTAs were timely filed when ENDS containing non-tobacco-derived nicotine became subject to the FDCA in 2022. *See supra* n.3.

11

product or consumable product from the FDA"; or (2) was marketed in the United States as of August 8, 2016, the manufacturer submitted a PMTA for the product by September 9, 2020, "and the application either remains under review by the FDA or has received a denial order that has been and remains stayed by the FDA or court order, rescinded by the FDA, or vacated by a court." N.C. Gen. Stat. § 143B-245.11(a)(1)-(2); N.C. Gen. Stat. § 14-313(a)(3c).[6]

Retailers are prohibited from selling—and distributors and wholesalers are prohibited from selling for retail sale—any ENDS products not listed in the directory starting 60 days after NCDOR publishes the directory. N.C. Gen. Stat. § 143B-245.13. Businesses that sell ENDS products not listed in the directory are subject to monetary penalties, seizure of the unauthorized products, and suspension and revocation of their licenses to sell ENDS. N.C. Gen. Stat. § 14-313(h)(1)-(2). Because S.L. 2024-31 designates repeated sales of unauthorized products a deceptive trade practice, competitors can also file suit against violators for treble damages and attorneys' fees. N.C. Gen. Stat. § 14-313(j); N.C. Gen. Stat. §§ 75-16, 75-16.1. The deceptive trade practice designation also potentially subjects sellers of unauthorized products to criminal prosecution and civil penalties of up to $5,000 per

---

[6] Copies of documentation issued by the FDA must be included with the manufacturer's certification. N.C. Gen. Stat. § 143B-245.11(b)(1).

12

violation, with each week of a continuous violation constituting a separate offense. N.C. Gen. Stat. §§ 75-313; 75-15.2; 75-8.

NCDOR published the directory on May 1, 2025, and announced that enforcement would commence on June 29, 2025. JA 26 ¶ 70; 211.

**III.    S.L. 2024-31 threatens the continued existence of the retailer Appellants' businesses and prevents the consumer Appellant from using the ENDS products she prefers.**

Appellants are a trade association and retailers, a manufacturer, and a consumer of electronic nicotine delivery system products. JA 4-6 ¶¶ 12-16. If the business Appellants continue to sell ENDS products not listed in the new directory, they will be subject to the above-mentioned litany of penalties. Enforcement of S.L. 2024-31 also means that the consumer Appellant, Reagan Murphy, will not have access to the ENDS products upon which she relies to keep from reverting to more dangerous traditional cigarettes. JA 23 ¶ 82; 26 ¶ 95. And if the retailer Appellants remove products not listed on the directory from their shelves, they will go out of business. JA 22-23 ¶¶ 79-80; 25-26 ¶¶ 92-93.

Historically, only 1.3% of the revenues generated from sales of ENDS products in Appellant AMV Holdings, LLC's ("AMV") North Carolina stores have come from sales of ENDS products listed on the NCDOR's directory. JA 91 ¶ 14-15. It is dubious whether even those sales could be sustained once enforcement starts because the directory fails to include any refillable ENDS device compatible with

13

many bottled e-liquid products found on the directory that contain freebase nicotine. *Id*. The loss in revenue and profits that will result from the NCDOR's enforcement of S.L. 2024-31's restrictions will force AMV to close 80% of the 24 brick-and-mortar shops that it owns and operates in North Carolina and will likely push the company into bankruptcy. JA 88 ¶ 5; 92 ¶ 18.

Similarly, e-liquid products listed on the directory only account for approximately 3 to 4 percent of Plaintiff Bright Leaf Vendors, Inc.'s ("Bright Leaf") revenues and profits from sales of ENDS products; Bright Leaf similarly faces closure of at least two, if not all three, of its three stores under enforcement of S.L. 2024-31's restrictions. JA 223 ¶ 9; 224 ¶¶ 11-12. Based on past experience following the enactment and enforcement of similar vapor product directory legislation in other states, the Vapor Technology Association's executive director anticipates that most specialty vape retailers in North Carolina will be forced to close their doors if enforcement of S.L. 2024-31 is not enjoined. JA 246-48, ¶¶ 12, 14. Put simply, enforcement of S.L. 2024-31 threatens the very existence of the Retail Appellants' businesses and this harm is both imminent and irreparable.

## IV.    Procedural history.

On April 30, 2025, Appellants filed a complaint in the United States District Court for the Eastern District of North Carolina seeking a declaratory judgment that S.L. 2024-31 violates the United States Constitution's Supremacy Clause and both

14

preliminary and permanent injunctions against the law's enforcement. JA 7. On May 16, 2025, Appellants filed a motion for a preliminary injunction. JA 48-86. As the retailer Appellants detailed in their supporting declarations, the vast majority of the products that they sell in their specialty vape shops are ENDS products that do not qualify for inclusion in the directory because they do not yet have FDA marketing authorization. JA 90 ¶ 9; 222 ¶ 7. Without the revenue generated by the sale of these products, Appellants face closure of their businesses, employee layoffs, and potential bankruptcy. JA 92-93 ¶¶ 16, 18-19; 224-25 ¶¶ 12-13.

Despite agreeing with Appellants that, with enforcement of S.L. 2024-31, they "will suffer substantial economic harm," the district court denied Appellants' motion on June 27, 2025. JA 502. The district court based its denial of Appellants' motion on a finding that S.L. 2024-31 is not impliedly preempted by 21 U.S.C. § 337(a) and, therefore, Appellants did not have a strong likelihood of success on the merits. JA 503-05.

Appellants filed their notice of appeal on June 30, 2025. JA 507-08. The district court's holding that S.L. 2024-31 is not preempted by 21 U.S.C. § 387j is squarely at odds with another recent district court decision concluding that a virtually identical Iowa statute was so preempted. *See Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Rev.*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 85732 (S.D. Iowa May 2, 2025) (appeal pending).

15

For the reasons detailed below, the district court erred as a matter of law.

## SUMMARY OF ARGUMENT

Appellants are likely to succeed on the merits of their implied preemption claim. S.L. 2024-31 conflicts with, and is preempted by, the exclusive discretion Congress granted the FDA in 21 U.S.C. § 337(a) to enforce (or not) the premarket authorization requirements established in 21 U.S.C. § 387j. The text, structure, purpose, and legislative history of the FDCA and TCA suggest that Congress intended section 337(a) to apply to the FDCA's tobacco authorities. And, contrary to the district court's holding, the TCA's preservation and savings clauses in 21 U.S.C. § 387p do not insulate from a finding of implied preemption a state restriction couched as a "sales" restriction that compels partial or full compliance with another provision of the TCA. S.L. 2024-31 compels such compliance because partial or full compliance with the premarket review requirements of 21 U.S.C. § 387j is a "critical element" of eligibility for listing on the NCDOR's directory. An interpretation to the contrary would tolerate state law requirements that actually conflict with federal requirements in violation of the Supreme Court's command that preservation and savings clauses do not "bar[] the ordinary working of conflict pre-emption principles." *Buckman*, 531 U.S. at 352 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)).

16

Appellants are also threatened with irreparable harm by enforcement of S.L. 2024-31. As the district court found, because the overwhelming majority of the retailer Appellants' revenues come from sales of ENDS products not eligible for listing on the NCDOR directory, their businesses "will suffer substantial economic harm, including the loss of sales revenue and the incursion of civil fines imposed by the North Carolina Department of Revenue." JA 502. These monetary losses, which put at risk the very existence of the retailer plaintiffs' businesses, will not be compensable because of sovereign immunity. As the district court found, "these injuries are imminent and directly traceable to enforcement of S.L. 2024-31." JA 502.

Finally, because of the strength of Appellants' claim that S.L. 2024-31 is unconstitutional and the irreparable harm with which they are threatened, the "merged" factors of the balance of equities and the public interest also weigh strongly in favor of a preliminary injunction. When a plaintiff establishes a likelihood that a defendant's action is unconstitutional, the plaintiff has also established that both the balance of equities and the public interest favor preliminary relief.

**STANDARD OF REVIEW**

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence

17

of preliminary relief, that the balance of equities balance in [its] favor, and that an injunction is in the public interest." *Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

"[T]he decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (citation and internal quotation marks omitted). Therefore, this Court reviews a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *Id.; see also United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) ("Faithful to the abuse-of-discretion standard, we are obliged to affirm a grant of a preliminary injunction when the district court applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute." (citation and internal quotation marks omitted)).

However, the "related legal conclusions involved in that decision" are reviewed *de novo*, while factual findings are reviewed for clear error. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102 (4th Cir. 2022); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2022). Whether a state statute is preempted is a legal issue that is reviewed *de novo*. *Air Evac EMS*, 37 F.4th at 102-03 (explaining that a district court's decision on preemption that underpinned its preliminary injunction order "is a legal issue, which . . . we review de novo"); *see also South Carolina*, 720

18

F.3d at 528-33 (conducting *de novo* review of district court's conclusions on preemption).

When a district court has improperly denied a motion for a preliminary injunction, this Court has the "power to vacate and remand a denial of a preliminary injunction with specific instructions for the district court to enter an injunction." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014); *accord Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 252 (4th Cir. 2003). And, if a district court's opinion denying a preliminary injunction fails to discuss all the relevant factors, "a court of appeals reviewing that denial should 'perform [its] own assessment of the factors not addressed by the district court.'" *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## ARGUMENT

**I.    Appellants are likely to succeed on the merits of their claim that 21 U.S.C. § 337(a) impliedly preempts North Carolina Session Law 2024-31's directory-related restrictions.**

The FDCA's implied preemption provision, 21 U.S.C. § 337(a), impliedly preempts S.L. 2024-31's directory-related restrictions. Contrary to the district court's conclusions, section 337(a) does not render the tobacco provisions' preservation and savings clauses a nullity and, even though it is couched as a sales restriction, because S.L. 2024-31 explicitly incorporates by reference and compels compliance with the TCA's premarket review requirements, it is preempted.

19

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const., art. VI, cl. 2). As relevant here, "state law is naturally preempted to the extent of any conflict with a federal statute." *Id.* at 372. This "implied conflict preemption" occurs where, *inter alia*, "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Title 21 U.S.C. § 337(a) provides that "[e]xcept as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this [Act] shall be by and in the name of the United States." The Supreme Court has held that section 337(a) "commits complete discretion to [the FDA] to decide how and when [the FDCA's enforcement provisions] should be exercised." *Heckler*, 470 U.S. at 835; *accord Andrews v. Conrail*, 831 F.2d 678, 686-87 (7th Cir. 1987) (holding that the FDA "is invested with discretionary authority to pursue or deny instituting enforcement actions . . . as the [agency] may deem appropriate"). And the Supreme Court and other courts, including this Court, have held that section 337(a) impliedly preempts any claim that seeks to directly or indirectly enforce the Act. *See, e.g.*, *Buckman*, 531 U.S. 341; *Matkari*, 7 F.3d at 1139.

20

In *Buckman*, plaintiffs alleged they suffered personal injuries caused by defective FDA-cleared medical devices. The plaintiffs' claims included state-law fraud claims based on an allegation that the defendant had obtained FDA clearance of the devices by submitting false reports to the FDA.[7] The Court held that the plaintiffs' state-law claims "conflict[ed] with" and were "therefore impliedly preempted by" the FDCA. 531 U.S. at 348.

The Court noted that the "conflict stem[med] from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the agency," that "this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives," and that such a balance could "be skewed by" the plaintiffs' claims. *Id*. In other words, the FDA "has at its disposal a variety of enforcement options," including "seeking injunctive relief and civil penalties, seizing the [products], and pursuing criminal prosecutions," that "allow the agency to make a measured response to suspected" violations of the FDCA. *Id*. at 349 (cleaned up). The FDA may also choose not to enforce certain violations of the FDCA.

The Court also explained why plaintiffs could not circumvent implied preemption by styling their claims as state-law claims. Unlike "traditional state tort

---

[7] The FDCA prohibits the submission of such false reports. *See* 21 U.S.C. § 331(q)(2); *see also* 21 U.S.C. § 360(k) (discussing required reports for devices).

21

law [claims] which had predated the federal enactments in question[],” plaintiffs’ “claims exist[ed] solely by virtue of the FDCA.” 531 U.S. at 353. In short, “the existence of [the FDCA]” was “a critical element in [plaintiffs’] case.” *Id*. Finally, the Court concluded that for “the reasons stated above,” plaintiffs’ claims “would exert an extraneous pull on the scheme established by Congress, and [those claims were] therefore preempted by that scheme.” 531 U.S. at 353.

Federal courts routinely rule that section 337(a) impliedly preempts a state law claim when that claim would not exist but for the existence of the FDCA. *See*, *e.g.*, *Loreto v. Proctor & Gamble Co.*, 515 Fed. Appx. 576, 579 (6th Cir. 2013) (“The question, then, is how to determine whether a claim formally asserted under state law is in substance one seeking to enforce the FDCA. The Supreme Court supplied the test in *Buckman*: If the claim would not exist in the absence of the FDCA, it is impliedly preempted.”); *Bryant v. Medtronic, Inc.*, 623 F.3d 1200, 1205 (8th Cir. 2010) (holding section 337(a) preempted state law claim that was based on manufacturer’s failure to file reports with the FDA in accordance with FDA regulations; “these claims are simply an attempt by private parties to enforce the [FDCA], claims foreclosed by § 337(a) as construed in *Buckman*”).

Courts have likewise arrived at the same conclusion—that the FDCA impliedly preempts a state law claim—when plaintiffs have asserted a claim under a state statute that itself references the FDCA. *See, e.g.*, *Nexus Pharms., Inc. v. Cent.*

22

*Admixture Pharm. Servs.*, 48 F.4th 1040, 1046 (9th Cir. 2022) (holding that when claims rely "on a state statute which itself relies on the federal statute," such claims stand as an obstacle to the FDA's enforcement discretion and are impliedly preempted); *Novo Nordisk Inc. v. Live Well Drugstore, LLC*, No. 23-cv-808, 2025 U.S. Dist. LEXIS 17792 (M.D. Fla. Jan. 30, 2025) (holding that section 337(a) impliedly preempted a Florida statute that prohibited the sale of drugs not approved by the FDA); *Regan v. Sioux Honey Ass'n Coop.*, 921 F. Supp. 2d 938, 944-45 (E.D. Wis. 2013) (holding claim that defendant violated Wis. Admin. Code § ATCP 90.10(1) was impliedly preempted because "a private party cannot attempt to enforce the FDCA under the guise of state law claims" (cleaned up)).

And the Ninth Circuit has found section 337(a) to provide the basis for a seller of tobacco products to obtain a preliminary injunction against a state attorney general's enforcement action because "the claim exist[ed] solely by virtue of the FDCA." *Grand River Enters. Six Nations v. Knudsen*, No. 23-35494, 2024 WL 2992503 (9th Cir. Jun. 14, 2024) (cleaned up).

Notwithstanding that S.L. 2024-31 explicitly cross-references and incorporates 21 U.S.C. § 387j and its premarket review procedures, the district court concluded that S.L. 2024-31 is not impliedly preempted by section 337(a) because such a reading "would render the Preservation and Savings Clauses" found in 21 U.S.C. § 387p(a)(1) and (a)(2)(B) a nullity. JA 505. The district court concluded that

23

because Appellants' implied preemption argument would "require [the district] court to ignore the directive" that 21 U.S.C. § 387p(a)(1) "does not 'limit the authority' of a State to enact and enforce laws with respect to the sale of tobacco products," S.L. 2024-31 was a valid exercise of North Carolina's preserved state police powers. *Id.*

The district court's legal conclusion is incorrect. There are many types of restrictions that North Carolina could conceivably enact under the preservation and savings clauses found in 21 U.S.C. § 387p(a)(1) and (a)(2)(B) that would not implicate section 337(a) and implied preemption because they would neither reference nor compel compliance with the FDCA, including flavor bans and nicotine strength limits. In each case, the preservation and savings provisions would not be rendered a nullity. But because S.L. 2024-31 both references and compels at least partial compliance with the FDCA's premarket review requirements found in 21 U.S.C. § 387j, the state statute is preempted.

Fundamentally, the district court's interpretation of the relationship between 21 U.S.C. § 387p and § 337(a) would nullify section 337(a) with respect to any State law requirement that could be couched as a "sales" restriction even if that requirement compelled compliance with one of the FDCA's tobacco provisions. The FDCA's text, structure, and legislative history demonstrate that such an outcome is inconsistent with Congress's intent.

24

A.     **The text and structure of the FDCA, including the Act's tobacco provisions, show that Congress intended section 337(a) to apply to tobacco products.**

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). In determining the intent of Congress, this Court considers the plain language of the statute, "but also its structure, purpose, and the legislative history as additional evidence of congressional intent." *Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 645 (4th Cir. 2018) (quoting *Ayes v. U.S. Dep't of Veterans Affairs*, 475 F.3d 104, 108 (4th Cir. 2006)); *see also Abramski v. United States*, 573 U.S. 169, 179 (noting that, in statutory interpretation, the Court "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history and purpose" (internal citation and quotation marks omitted)).

Section 337(a) has been part of the FDCA since Congress enacted the Act in 1938. *See* 52 Stat. 1040, 1046 (1938). Section 337(a) is found in Chapter III of the FDCA (codified as subchapter III of chapter 9 of title 21 of the United States Code), which is titled "Prohibited Acts and Penalties." Other provisions in Chapter III prohibit the interstate distribution of any "food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded," 21 U.S.C. § 331(a), and provide mechanisms for the FDA to enforce that prohibition, 21 U.S.C. §§ 332-334. The FDCA's product-category-specific requirements, including the definitions of "adulterated" and "misbranded" as those terms are applied to categories of products,

25

are located in Chapters IV, V, VI of the FDCA. *See*, *e.g.*, 52 Stat. at 1046 ("Chapter IV—Food"); 1049 ("Chapter V—Drugs and Devices"); *id*. at 1054 ("Chapter VI—Cosmetics"); *see also* 21 U.S.C. § 387b (adulteration provision for tobacco products).

As originally enacted in 1938, the FDCA did not include any savings or express preemption clauses. But because the FDCA's subsequently enacted savings and express preemption clauses are product-category-specific, Congress has typically placed them in the FDCA chapter dedicated to that product category. *See, e.g.*, 21 U.S.C. § 346a(n)(8) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 350e(e) (preemption clause regarding food; located in Chapter IV); 21 U.S.C. § 350g(*l*)(6) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 360k(a) (preemption clause regarding medical devices; located in Chapter V); 21 U.S.C. § 364j (preemption and savings clauses regarding cosmetics; located in Chapter VI).[8] Significantly, no court has ever held that any of the FDCA's savings or express preemption clauses for food, drugs, medical devices, or cosmetics limits the scope of section 337(a)'s prohibition on parties other than the federal government enforcing the FDCA.

---

[8] Additional savings and preemption clauses are found in the FDCA at 21 U.S.C. §§ 379r, 379s, 379aa, and 379aa-1.

Indeed, Congress has recognized that because of the FDCA's structure, any statutory limitation on the scope of section 337 must come through an amendment to section 337, not through an amendment to provisions in one of the product-category-specific chapters of the FDCA. In 1990, Congress amended the FDCA through the Nutrition Labeling and Education Act ("NLEA"). Pub. L. 101-535, 104 Stat. 2353 (1990). The NLEA expanded the FDA's authority over food labeling by revising various provisions within Chapter IV of the Act. The NLEA also limited the scope of section 337 by granting states the authority to enforce some of the FDCA's prohibitions on the distribution of "misbranded" food products. But Congress did not adopt that limitation on the scope of section 337 through an amendment to Chapter IV. Instead, it did so by amending section 337 itself to create a new subsection (b) that allows States to bring proceedings to enforce and restrain violations of certain food-related provisions of the FDCA. *See* 104 Stat. at 2362 (creating 21 U.S.C. § 337(b)).

Congress's decision to limit the scope of section 337 by amending section 337 makes sense. After all, people reading section 337 should not be expected to read every other provision of the FDCA, including provisions in other chapters of the FDCA, to find out whether Congress has limited the scope of section 337(a). Unlike with food products, Congress has never enacted a new subsection of section 337 that exempts tobacco products from the operation of section 337(a).

Consideration of other preemption provisions found in the FDCA reinforces the conclusion that Congress intended section 337(a) to apply to tobacco product requirements. In describing state requirements that are expressly preempted in several other provisions, Congress repeatedly used the formulation ". . . different from, in addition to, or *otherwise not identical to . . .*" the FDCA's requirements. *See* 21 U.S.C. §§ 364j(a), 379aa(h)(1), 379aa-1(h)(1), and 379s(a) (emphasis added). However, the TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), does not include the term "otherwise not identical to." Congress's omission of that language reflects Congress's intent to impliedly preempt under section 337(a) state law requirements that compel compliance with the TCA's requirements because they incorporate the TCA's requirements by reference.

**B.    When it enacted the TCA, Congress understood from *Buckman* and its progeny that section 337(a) could impliedly preempt state law duties if the "existence of" the TCA was a "critical element" of those duties.**

One well-settled canon of statutory construction is that courts must "assume that Congress is aware of existing [case] law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979)). So, courts must assume that Congress was aware of case law interpreting the FDCA—including *Buckman* and its progeny—when it passed the TCA in 2009.

28

As noted above, in *Buckman*, the Court held that section 337(a) impliedly preempted the plaintiffs' state law claims because "the existence of [the FDCA] was a critical element" of the defendant's purported state law duties. 531 U.S. at 353. The Court reasoned that such "claims inevitably conflict with the FDA's responsibility" to enforce the FDCA "consistently with the [Agency's] judgment and objectives." *Id.* at 350; *accord Nathan Kimmel v. DowElanco,* 275 F.3d 1199, 1206 (9th Cir. 2002) (stating that the "key factor identified by the Supreme Court in concluding that Buckman's claims were pre-empted was that 'the existence of [the FDCA was] a critical element in [the] case'"). Therefore, when Congress passed the TCA in 2009, it knew that section 337(a) could impliedly preempt any state law if the existence of the TCA was a critical element of a person's duties under that state law. Had Congress wanted to avoid implied preemption of state law duties or claims that depend on the existence of the TCA, it would have amended section 337.

And *Buckman* is applicable to the TCA notwithstanding the TCA's preservation, express preemption, and savings clauses. The *Buckman* plaintiffs argued that there should be no finding of implied conflict preemption under section 337(a) because the FDCA included an express preemption provision for medical devices. *Buckman,* 531 U.S. at 863. That express preemption provision preempts any State law requirement "(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device, and (2) which relates to the safety or

29

effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA]." But the Court rejected the plaintiffs' argument because "neither an express preemption provision nor a savings clause 'bars the ordinary working of conflict pre-emption principles.'"). *Buckman*, 531 U.S. at 352 (quoting *Geier*, 529 U.S. at 869).

> **C.    In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).**

The text, legislative history of the TCA, and the practical effect of section 387p's preservation and savings clauses all support the conclusion that Congress did not intend those clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).

> **1.    The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a).**

The plain language of section 387p's preservation clause demonstrates that Congress did not intend section 387p to limit the applicability of section 337(a). As codified in the United States Code, section 387p(a)(1) states: "Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . a State . . . ."[9] The

---

[9] As originally enacted, the Tobacco Control Act used the term "chapter" instead of "subchapter." *See* Pub. L. 111-31, 123 Stat. at 1823. However, "chapter" as used there clearly referenced what was ultimately codified in the United States Code as

"subchapter" referenced in subsection (a)(1) is subchapter IX of the FDCA, the TCA's provisions relating to the FDA's regulation of tobacco products. However, as noted above, as codified, section 337(a) is found in subchapter III of the FDCA. If Congress had intended section 387p to limit the implied preemptive effect of section 337(a), it would not have referenced only the subchapter referencing the FDCA's tobacco provisions, but rather "Food, Drug, and Cosmetic Act" or "Act" to refer to the entirety of the FDCA or some other language to explicitly encompass section 337(a) in subchapter III. *See, e.g.*, 21 U.S.C. § 346a ("***Nothing in this Act*** preempts the authority of any State or political subdivision to require that a food containing a pesticide chemical residue bear or be the subject of a warning or other statement relating to the presence of the pesticide chemical residue in or on such food.") (emphasis added); 21 U.S.C. § 387a-1(a)(1)(A) (providing for the issuance of a final rule "under . . . the Federal Food, Drug, and Cosmetic Act"). The fact that Congress did not do so reflects Congress's intent for section 337(a) to apply equally to the TCA's requirements as to any other provision of the FDCA.

This conclusion is reinforced by cases addressing an express preemption provision similar to that found in section 387p. The TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), is modeled on the FDCA's express

---

subchapter IX of Chapter 9 of Title 21. *See* 123 Stat. at 1784 (referencing "Chapter IX—Tobacco Products").

preemption provision for medical devices. *See* 21 U.S.C. § 360(k) (preempting any State or local requirement "which is different from, or in addition to, any requirement applicable under this Act to the device"). And federal "courts have generally agreed that" a state law claim survives preemption under section 360k only if it "is premised on conduct that both (1) violates the FDCA, and (2) *would give rise to recovery under state law even in the absence of the FDCA.*" *Scanlon v. Medtronic Sofamor Danek USA, Inc.*, 61 F. Supp. 3d 403, 411 (D. Del. 2014) (collecting cases) (emphasis added). S.L. 2024-31's directory restrictions do not meet that test because they explicitly cross-reference 21 U.S.C. § 387j; they could not provide for either a legal duty by a seller of ENDS products or an action against that seller in the absence of the FDCA.

> **2.      The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products.**

As noted above, the district court's holding has the effect of nullifying section 337(a) whenever a state law requirement is couched as a "sales" restriction. The legislative history of the TCA, however, indicates that Congress did not intend the TCA's preservation and savings clauses to limit the scope of section 337(a).

When Congress was considering the TCA, members of Congress introduced an amendment that would have created a separate statutory scheme outside of the FDCA (including an agency outside of the FDA) to regulate tobacco products. *See*

H.R. Rep. No. 111-58, pt. 1, at 6 (Mar. 2009). That separate statutory scheme—the Youth Prevention and Tobacco Harm Reduction Act (the "THR Act")—included a provision substantively identical to 21 U.S.C. § 337(a) and a preservation clause identical to the one in the TCA. *See* H.R. 1261, THR Act § 104 ("All proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States."), THR Act § 119 ("Preservation of State and Local Authority") (Mar. 3, 2009).

The authors of the THR Act understood that their proposed legislation's preservation clause (section 119) did not nullify their proposed legislation's section 337(a)-like provision (section 104). That understanding makes sense because one provision of an act cannot be read as implicitly nullifying another provision of that same act. *See, e.g.*, *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 510 n.22 (1986) ("It is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (internal quotation and citation omitted); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, . . . rather than to emasculate an entire section.") (internal quotations and citation omitted).

So, it stands to reason that Congress did not intend the TCA's preservation and savings clauses—21 U.S.C. § 387p(a)(1) and (a)(2)(B)—to implicitly exclude State tobacco product regulations from the scope of section 337(a). Rather, Congress

33

intended section 337(a) to impliedly preempt statutes enacted pursuant to a State's preserved powers if they generate a conflict with the FDA's balancing of competing Congressional objectives in enacting the TCA.

> **3.    The district court's interpretation of section 387p would allow a State to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity.**

As a practical matter, the district court's interpretation would also impose no restrictions on a State's ability to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and thereby render the express preemption provision of section 387p(a)(2)(A) a nullity.

For example, the FDCA requires tobacco product manufacturing facilities to register with the FDA, *see* 21 U.S.C. § 387e(b); and it authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured in a non-FDA-registered facility.[10] But under the district court's reading of section 387p, a State could enforce the section 387e(b) registration requirement through a "sales restriction" that

---

[10] The FDCA deems any tobacco product to be "misbranded" if it was manufactured in a non-FDA-registered facility, *see* 21 U.S.C. § 387c(a)(6); the FDCA prohibits the sale of any "misbranded" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "misbranded" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

34

prohibits the sale of tobacco products manufactured in non-FDA-registered facilities. As another example, the FDCA requires the manufacturer or importer of certain tobacco products to pay a quarterly "user fee" to the FDA, *see* 21 U.S.C. § 387s; and it authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured or imported by someone who has not paid the required user fee.[11] But under the district court's interpretation of section 387p, a State could enforce the section 387s user fee requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured or imported by a person who did not pay the required user fee.

The situations discussed in the previous paragraph are no different from the situation here. The FDCA requires the manufacturer of any "new" tobacco product—including an ENDS product—to obtain FDA marketing authorization through the premarket tobacco product application process under 21 U.S.C. § 387j. The FDCA also authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a new tobacco product

---

[11] The FDCA deems any tobacco product to be "adulterated" if it was manufactured or imported by someone who has not paid the required user fee," *see* 21 U.S.C. § 387b(4); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

35

that does not have FDA marketing authorization.[12] But under the district court's reading of section 387p, a State could enforce the section 387j premarket authorization requirement through a "sales restriction" that prohibits the sale of tobacco products that require, but lack, FDA marketing authorization or a pending application for the same.

In short, under the district court's interpretation, there would be no limitations on what TCA requirements states could indirectly enforce as "sales" restrictions or requirements. And, because States could enforce any TCA requirement under the guise of a sales restriction or requirement, the express preemption provision of Section 387p(a)(2)(A) that prohibits state requirements "different from, or in addition to, any requirement under [the TCA] relating to tobacco products standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products" would be rendered a nullity. Such an interpretation is to be avoided. *See Psinet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004) ("General principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render

---

[12] The FDCA deems any tobacco product to be "adulterated" if the product requires, but lacks, FDA premarket authorization, *see* 21 U.S.C. § 387b(6); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

36

a term redundant."); *Baker v. Bethlehem Steel Corp.*, 24 F.3d 632, 634 (4th Cir. 1994) ("It is well settled that a statute must not be interpreted to render a portion of the statute meaningless or without effect."); *United States v. Wayda*, 966 F.3d 294, 307 (4th Cir. 2020) ("[I]t is well-settled that 'courts should disfavor interpretations of statutes that render language superfluous.'").

A hypothetical illustrates how the district court's reading of section 387p could result in the nullification of its express preemption provision. It is well established that the FDCA "rests upon the constitutional power resident in Congress to regulate interstate commerce." *United States v. Walsh*, 331 U.S. 432, 434, (1947). However, it is entirely possible that a tobacco product manufacturer—be it a manufacturer of e-liquid or (if a different sort of state registry requirement were at issue) a North Carolina grower of tobacco who rolls little cigars—is engaged in manufacturing and sales activities that are entirely intrastate and do not affect interstate commerce. In such a situation, but for S.L. 2024-31, that e-liquid manufacturer would not be subject to the FDCA's requirement that it submit an application for premarket authorization for its products in order to manufacture and sell its products on an entirely intrastate basis.

But, under the district court's interpretation of the language relating to "sales" in section 387p(a)(1)'s preservation clause and section 387p(a)(2)(B)'s savings clause, S.L. 2024-31's expansion of the FDCA's premarket review requirement to

37

manufacturers operating completely intrastate would be readily permissible because section S.L. 2024-31 is merely a "sales" restriction. And this reading would render a nullity the express preemption language in section 387p(a)(2)(A) that prohibits any "requirement which is different from, *or in addition to*, any requirement under the provisions of this subchapter relating to . . . premarket review . . . ." (emphasis added). Because such an e-liquid manufacturing businesses would not otherwise be subject to the FDCA's premarket review requirements due to its fully intrastate operations, S.L. 2024-31's imposition of those requirements on that business would be "in addition to" the requirements of the TCA.

The foregoing hypothetical illustrates why the district court's holding regarding the scope of permissible state sales restrictions under 21 U.S.C. § 387p is overbroad and cannot include requirements that are duplicative of those found in the FDCA. In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state "sales" restrictions that compel compliance with other provisions of the TCA from implied preemption under 21 U.S.C. § 337(a).

**D.**  **The district court's interpretation would tolerate state law requirements that actually conflict with federal requirements, violating the Supreme Court's command that preservation and savings clauses do not bar the ordinary working of conflict preemption principles.**

S.L. 2024-31 creates a genuine conflict with the FDA's exclusive enforcement authority under 21 U.S.C § 337(a), and the discretion with which Congress entrusted

38

the FDA to enforce 21 U.S.C. 387j. Yet the district court's holding would suggest that Congress intended 21 U.S.C. § 387p's preservation and savings clauses to impede basic principles of conflict preemption even where actual conflict between the state and federal government's approaches exists. This is an illogical conclusion, and this Court should not accept it. *See*, *e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *In re Irby*, 858 F.3d 231, 237 (4th Cir. 2017) ("[I]n interpreting statutes, we are instructed to use . . . our 'common sense' to avoid an absurd result." (quoting *Abramski*, 134 S. Ct. at 2267)); *Heuer v. United States Secretary of State*, 20 F.3d 424, 427 (11th Cir. 1994) ("[I]nterpretations of statutes which lead to illogical or self-defeating results should not be imputed to the Legislature as the intended meaning of the statute.").

"The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (2002)). And as the Supreme Court has repeatedly declared, a savings clause "does *not* bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869; *cf.* 73 Fed. Reg. 49603, 49605 (Aug. 22, 2008) ("FDA does not believe that the

39

absence of an express preemption provision with respect to drugs affects the application of the doctrine of implied preemption."). When state law permits "actions that 'actually' conflict' with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect." *Geier*, 529 U.S. at 872. "To the extent that such an interpretation of the savings provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the [Supreme] Court has put it before, to 'destroy itself.'" *Id*. (quoting *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 228 (1998)).

When Congress enacted the TCA, it charged the FDA with reducing serious tobacco-related disease and death, which is primarily caused by traditional, combustible cigarettes. *See* TCA, § 3(9), 123 Stat. at 1782 (stating that one of the purposes of the TCA is "to promote cessation to reduce disease risk and the social costs associated with tobacco-related diseases"). One of the ways Congress identified to reduce such disease and death was to give the FDA "new and *flexible* enforcement authority" over "less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782 (emphasis added).

40

Since ENDS became subject to the FDA's regulatory authority in 2016, the FDA has continually communicated to the ENDS industry its policy of discretionary enforcement. This is because the FDA has recognized that removing most or all ENDS products from the market would have negative health outcomes. In the FDA's own words, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." JA 96.

Congress entrusted the FDA with exclusive enforcement discretion to strike a balance between the risks and benefits to public health of allowing unauthorized ENDS products to remain on the market when few FDA-authorized ENDS have been available. By indirectly enforcing 21 U.S.C. § 387j, S.L. 2024-31 directly conflicts with the FDA's considered and communicated approach of enforcement discretion and is therefore preempted. *See Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption."); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66-67 (2002) (noting that "a federal decision to forgo regulation in a given area may imply an authoritative federal

41

determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.") (emphasis in original).

To read 21 U.S.C. § 387p to tolerate the conflict that S.L. 2024-31 creates with the FDA's enforcement discretion approach when it comes to 21 U.S.C. § 387j would permit the FDCA to defeat its own objectives. It is antithetical to the principle of federal preemption that the existence of a savings provision would require the toleration of this conflict. *See Geier*, 529 U.S. at 871 ("Why . . . would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?"). For this fundamental reason, "[t]he [Supreme] Court has thus refused to read general 'saving' provisions to tolerate actual conflict . . . in "frustration-of-purpose" cases[.]" *Id*. at 873-74.

Federal courts have repeatedly held that state laws that conflict with or create an obstacle to a federal agency's enforcement discretion are preempted. *See e.g.*, *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025) ("Even accepting Iowa's interpretation, Section 2 is still an obstacle to the exercise of the discretion that Congress gives to federal officials charged with enforcing federal immigration law.") (collecting cases), *underlying decision later vacated*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Arizona*, 567 U.S. at 406 ("Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. The

42

[Supreme] Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'") (quoting *Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 287, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971)).

S.L. 2024-31 conflicts with the FDA's method of enforcement of the FDCA by deputizing the NCDOR to indirectly enforce 21 U.S.C. § 387j against sellers of ENDS products that lack premarket authorization, and also creates an avenue for competing private parties to sue sellers of ENDS products that lack marketing authorization for treble damages under North Carolina's unfair and deceptive trade practices statutes. *See* N.C. Gen. Stat. § 14-313(j); N.C. Gen. Stat. §§ 75-16, 75-16.1. The deceptive trade practice designation also potentially subjects sellers of unauthorized products to criminal prosecution and civil penalties of up to $5,000 per violation, with each week of a continuous violation constituting a separate offense. N.C. Gen. Stat. §§ 75-313; 75-15.2; 75-8. This goes far beyond the FDA's historical approach when it has determined that an ENDS product lacking marketing authorization should be removed from the market, which is to issue Warning Letters to "give individuals and firms an opportunity to take voluntary and prompt corrective action before [the FDA] initiates an enforcement action." *See* Food and Drug Administration Regulatory Procedures Manual, July 2024, Ch. 4 Advisory Actions, § 4-1-1, *available at* https://www.fda.gov/media/71878/download.

43

Congress tasked the FDA with reducing disease and death caused by traditional tobacco products, and in so doing, the FDA made the "deliberate choice" to leave many unauthorized ENDS products on the market by deferring enforcement of 21 U.S.C. § 387j. *Arizona*, 567 U.S. at 405. The NCDOR's indirect enforcement of 21 U.S.C. § 387j through S.L. 2024-31 is "inconsistent with federal policy and objectives." *Id*. The Supreme Court "has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Geier*, 529 U.S. at 870 (quoting *U.S. v. Locke*, 529 U.S. 89, 106 (2000)). So, too, should this Court decline to read 21 U.S.C. § 387p to tolerate this conflict.

**E.     Even examining section 387p in isolation, S.L. 2024-31 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i).**

Even if one were to ignore section 337(a) and implied preemption in their entirety, the TCA's express preemption clause, section 387p(a)(2)(A), would still preempt S.L. 2024-31. This is the case because S.L. 2024-31 contains premarket review, adulteration, and registration requirements that are "different from" or "in addition to" those imposed by the TCA and, as explained above, adopting the district court's overbroad interpretation of section 387p's savings clause would otherwise render section 387p(a)(2)(A)'s limitations on State authority a nullity.

44

As discussed, 21 U.S.C. § 387j and 21 C.F.R. §§ 1114.1-1114.49 govern the FDA's premarket review process for ENDS products. Under the FDCA, ENDS products that lack a marketing granted order are considered "adulterated" under 21 U.S.C. § 387b(6)(A) and their sale in interstate commerce is prohibited under 21 U.S.C. § 331(a)-(c). Moreover, manufacturers of tobacco products have an independent statutory obligation to register all tobacco products that they are manufacturing for commercial distribution under 21 U.S.C. § 387e(i). Failure to properly register a tobacco product similarly renders that product "adulterated" and prohibits its sale in interstate commerce. *See* 21 U.S.C. § 331(p).

S.L. 2024-31 imposes specific requirements related to premarket review, adulteration, and registration that are not found in these provisions of the TCA or the FDA's associated regulations. For example, to be included in NCDOR's directory, in addition to submitting a PMTA to FDA, a manufacturer must pay an initial fee of $2,000 per product, along with a renewal fee of $500. N.C. Gen. Stat. § 143B-245.11(b)(2). Neither the FDCA nor the FDA requires payment of any such fee to register an ENDS product with the FDA, nor to submit a PMTA or obtain a marketing order from the FDA.

Similarly, S.L. 2024-31 provides that a manufacturer's products are not eligible for the directory if at some point the manufacturer sold products in North Carolina that were required to be certified when the product had not been certified

45

and listed on the directory. N.C. Gen. Stat. § 143B-245.11(b)(4). Nothing in the FDCA, however, prevents a manufacturer from registering its product or from obtaining a marketing granted order for its product if the product was previously adulterated because it lacked a marketing granted order or was not properly registered with the FDA. Finally, the hypothetical presented earlier demonstrates how S.L. 2024-31 would extend the FDCA's premarket review requirements to manufacturers engaged in exclusively intrastate business and thereby impose on them premarket review requirements that are "in addition to" those that would otherwise apply to their limited scope of operations. For these additional reasons, even without considering the effects of section 337(a), the express preemption language of 21 U.S.C. § 387p(a)(2)(A) would prohibit enforcement of S.L. 2024-31.

For each of these reasons, the text, structure, purpose, and legislative history of the FDCA and TCA require the conclusion that S.L 2024-31 is preempted. Appellants are likely to succeed on the merits of their preemption claim.

## II.    The NCDOR's threatened enforcement of S.L. 2024-31 irreparably harms Appellants.

Finding that Appellants had Article III standing, the district court recognized that, with enforcement of S.L. 2024-31, Appellants "will suffer substantial economic harm, including the loss of sales revenue and the incursion of civil fines imposed by the North Carolina Department of Revenue." JA 502. In so doing, the district court noted that, because the majority of ENDS products that the retailer Appellants carry

46

in their stores do not have a pathway to inclusion on the directory, the loss in sales revenue and profits will force them to close their doors, lay off employees, and potentially file for bankruptcy. *See* JA 88 ¶ 5; 92 ¶ 18 (advising that only 1.3% of Appellant AMV's revenue from ENDS sales comes from products listed on the directory and that the loss of revenue from products not eligible for listing on the directory would force the company to close 80% of its brick-and-mortar stores); JA 223 ¶ 9; 224 ¶¶ 11-12 (advising that the comparable percentage for Appellant Bright Leaf Vendors is 3-4%). Further, the district court observed that "these injuries are imminent and directly traceable to enforcement of S.L. 2024-31." JA 502. While the district court did not independently analyze irreparable harm outside of the standing context, the facts remain unchanged; there is no reason that the district court's conclusion that Appellants will suffer irreparable harm with enforcement of S.L. 2024-31 should be different now.

Further, as noted above, the NCDOR's enforcement of S.L. 2024-31 subjects the business Appellants to potential fines and civil penalties for non-compliance, as well as third-party lawsuits from competitors. And because sovereign immunity prevents Appellants from recovering monetary damages from the State of North Carolina for fines, civil penalties, and loss of business revenue and profits, these harms are irreparable. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) (observing that pandemic-era eviction moratorium

47

"has put applicants . . . at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery"); *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (holding that economic harm is "irreparable" if it "threatens the very existence of the movant's business"); *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (same).

Finally, courts in this circuit have held that where, as here, a challenged statute is later found to be unlawful, the resulting harms are particularly unjust. *See, e.g.*, *Air Evac EMS, Inc. v. Dodrill*, 548 F. Supp. 3d 580, 594 (S.D. W.Va. 2021) (finding plaintiff would suffer irreparable harm from federally preempted state statute that subjected him to "fines and penalties"); *Tafas v. Dudas*, 511 F. Supp. 2d 652, 668 (E.D. Va. 2007) ("The Fourth Circuit has found irreparable harm sufficient to warrant an injunction in cases where monetary damages are inadequate, particularly in the case of government action later found to be unlawful.") (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991), and *Bowe Bell & Howell Co. v. Harris*, 145 Fed. Appx. 401, 404 (4th Cir. 2005)). Accordingly, this factor weighs strongly in favor of an injunction.

III. **The balance of harms and public interest favor enjoining enforcement of S.L. 2024-31.**

The district court did not address the balance of harms when it denied Appellants' motion for preliminary injunction. Nevertheless, its finding of

irreparable harm, and Appellants' arguments on the merits herein, should convince this Court that this factor also weighs in favor of an injunction.

When the government is the defendant, the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Appellants have established a strong likelihood of success on the merits of their appeal and they are threatened with irreparable harm by the NCDOR's enforcement of S.L. 2024-31 while they await a final judgment, the balance of equities and the public interest factors weigh in their favor. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (noting that "our precedent counsels that a state is in no way harmed by the issuance of a preliminary injunction which prevents a state from enforcing restrictions likely to be found to be unconstitutional") (cleaned up); *Bank One, N.A. v. Gattau*, 190 F.3d 844, 847 (8th Cir. 1999) (holding that where a plaintiff proves that a state law is preempted and irreparably harms the plaintiff, "the question of harm to the State and the matter of the public interest drop from the case" because the plaintiff "will be entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law"); *see also Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (stating that when a plaintiff establishes "a likelihood that" a defendant's action "violates the U.S. Constitution," the plaintiff has "also established that both

49

the public interest and the balance of the equities favor a preliminary injunction"). Therefore, the balance of equities and public interest also favor an injunction.

## CONCLUSION

For the foregoing reasons, the Court should vacate the district court's June 27, 2025 order and instruct the district court to enter an order preliminarily enjoining enforcement of S.L. 2024-31.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Appellants respectfully request oral argument. This appeal raises important legal questions regarding the interpretation and interplay of the implied preemption provision of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 337(a), and the FDCA's preservation, express preemption, and savings clauses applicable to its tobacco product authorities, 21 U.S.C. § 387p. Oral argument would assist the Court in resolving this appeal.

Dated: August 14, 2025      Respectfully submitted,

THOMPSON HINE LLP

By:   /s/ Eric N. Heyer
     Eric N. Heyer
     James C. Fraser
     Anna Stressenger
     1919 M Street, NW, Suite 700
     Washington, DC 20036
     Phone: 202.331.8800
     Fax: 202.331.8330
     Eric.Heyer@ThompsonHine.com
     James.Fraser@ThompsonHine.com
     Anna.Stressenger@ThompsonHine.com

     *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2025, I caused a true and correct copy of the foregoing Appellants' Brief to be filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system and to thereby be served via electronic mail on all counsel of record.

     /s/ Eric N. Heyer
     Eric N. Heyer

51

**CERTIFICATE OF COMPLIANCE**

I hereby certify that Appellants' Brief complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the Brief contains 12,060 words, excluding the items exempted under Fed. R. App. P. 32(f).

The Appellants' Brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

/s/ Eric N. Heyer
Eric N. Heyer

52