December 23, 2025

**_Via CM/ECF_**

Hon. Nwamaka Anowi
Clerk, United States Court of Appeals
for the Fourth Circuit
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 501
Richmond, Virginia 23219-3517

      RE:   *Vapor Technology Association v. Wooten*
           **Case No. 25-1745**

Dear Ms. Anowi:

      Pursuant to FRAP 28(j), Appellants enclose herewith a supplemental authority—*NOVA Distro, Inc. v. Virginia Attorney General*, No. 25-cv-8579, slip op. (E.D. Va. Dec. 18, 2025).

      *NOVA* involves a Virginia statute that, like the North Carolina statute at issue in the case *sub judice*, prohibits the sale of an e-cigarette unless FDA has authorized sale of the e-cigarette or an application for FDA authorization is pending. Plaintiffs in *NOVA*, e-cigarette distributors, alleged that the Food, Drug, and Cosmetic Act, 21 U.S.C. § 337(a), impliedly preempts a state statute that enforces the FDCA's e-cigarette premarket authorization requirement. Virginia argued that the distributors did not satisfy the "injury" requirement for Article III standing because the distributors' sale of unauthorized e-cigarettes is "illegal." Virginia also argued that the FDCA's explicit preservation of state authority to regulate the "sale" of tobacco products, 21 U.S.C. § 387p, renders section 337(a) inapplicable to a state statute that enforces the FDCA's premarket authorization requirement. The district court rejected Virginia's arguments.

      **_First_**, the court held that Virginia could not defeat standing based on the fact that plaintiffs sell products that do not meet FDCA requirements. Slip op. at 11 ("The Court finds that Plaintiffs have established Article III standing."). The court reasoned: "If standing turned on a plaintiff's perfect adherence to federal

Eric.Heyer@thompsonhine.com  Fax: 202.331.8330  Phone: 202.263.4128

THOMPSON HINE LLP
ATTORNEYS AT LAW

1919 M Street, N.W., Suite 700
Washington, D.C. 20036-3537

www.ThompsonHine.com
O: 202.331.8800
F: 202.331.8330



requirements, states could sidestep preemption review simply by pointing to an alleged violation of the very federal standards they may be forbidden to enforce." *Ibid*.

    **_Second_**, the court held that section 387p does render section 337(a) inapplicable to tobacco products. *Id.* at 43 ("Congress placed 'new tobacco' regulations within the FDCA, with full awareness of § 337(a), thereby leaving *Buckman* applicable by design."); *id.* at 31 ("[N]othing in the text of [section 387p] addresses or in any way abrogates § 337(a)'s exclusive grant of enforcement authority of the FDCA and regulations promulgated thereunder to the federal government or *Buckman*'s clear reinforcement of that exclusively federal authority"); *id.* at 42 ("When Congress intends to permit states to enforce provisions of the FDCA, it does so explicitly, as demonstrated by the exceptions enumerated in Section 337(b).").

                        Respectfully submitted,

                        */s/ Eric N. Heyer*
                        Eric N. Heyer
                        *Counsel for Appellants*

Enclosure.
cc (via CM/ECF): All counsel of record.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

NOVA DISTRO, INC., *et al.*,
     Plaintiffs,

     v.                                    Civil No. 3:25cv857 (DJN)

VIRGINIA ATTORNEY GENERAL
JASON MIYARES, *et al.*,
     Defendants.

## ORDER
### (Granting in Part Defendants' Motion to Dismiss;
### Granting in Part Plaintiff's Motion for Preliminary Injunction)

     This matter comes before the Court on Defendants Virginia Attorney General Jason Miyares and Virginia Tax Commissioner James J. Alex's (collectively, "Defendants") Motion to Dismiss (ECF No. 14 ("Motion to Dismiss")) and Plaintiffs NOVA Distro, Inc. and Tobacco Hut and Vape Fairfax, Inc.'s (collectively, "Plaintiffs") Motion for Preliminary Injunction ((ECF No. 16 ("Preliminary Injunction Motion")).  For the reasons set forth in the accompanying Memorandum Opinion, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss (ECF No. 14) and GRANTS IN PART and DENIES IN PART Plaintiffs' Preliminary Injunction Motion (ECF No. 16).  Specifically, the Court hereby ORDERS that:

     1.     Counts II and III of Plaintiffs' Complaint (ECF No. 1) are DISMISSED WITH PREJUDICE.

     2.     Defendants' Motion to Dismiss (ECF No. 14) is DENIED as to Count I.

3.    Defendants are preliminarily enjoined from enforcing Va. Code §§ 59.1-293.17(D) and 59.1-293.20(A)–(D), and any enforcement actions predicated on those provisions, to include such enforcement actions under §§ 59.1-293.16 and 59.1-293.21.

4.    Defendants are permitted to enforce all other provisions of Chapter 23.2.

5.    No security bond shall be required under Federal Rule of Civil Procedure 65(c).

The Court notes that the Fourth Circuit is currently considering an appeal involving a similar constitutional challenge to a similar North Carolina statute, with oral argument scheduled for January 29, 2026. *Vapor Technology Association v. McKinley Wooten, Jr.*, Docket No. 25-1745 (4th Cir.). As such, the Court will enjoin Defendants' enforcement of Va. Code §§ 59.1-293.17(D) and 59.1-293.20(A)–(D) until the Fourth Circuit issues its decision in *Vapor Technology Association v. McKinley Wooten, Jr*. Once the Fourth Circuit issues its decision on that case, the parties in this case may move for the Court's reconsideration of the suitability of the preliminary injunction in this matter.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  December 18, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

NOVA DISTRO, INC., *et al.*,
     Plaintiffs,

     v.                             Civil No. 3:25cv857 (DJN)

VIRGINIA ATTORNEY GENERAL
JASON MIYARES, *et al.*,
     Defendants.

## **MEMORANDUM OPINION**

Plaintiffs NOVA Distro, Inc. and Tobacco Hut and Vape Fairfax, Inc. (collectively, "Plaintiffs") submitted a Complaint (ECF No. 1 ("Complaint" or "Compl.")) against Defendants Virginia Attorney General Jason Miyares and Virginia Tax Commissioner James J. Alex (collectively, "Defendants"). In their Complaint, Plaintiffs challenge the constitutionality of several sections of Chapter 23.2 of Title 59.1 of the Virginia Code, codified at Va. Code §§ 59.1-293.10–22 ("Chapter 23.2"), under the United States Constitution and the Constitution of Virginia. Defendants filed a Motion to Dismiss Plaintiff's Complaint on November 19, 2025. (ECF No. 14 ("Motion to Dismiss").) Plaintiffs then filed a Motion for Preliminary Injunction, asking this Court to enter a preliminary injunction against the enforcement of Chapter 23.2. (ECF No. 16 ("Preliminary Injunction Motion").) For the reasons set forth below, the Court will GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss (ECF No. 14) and will GRANT IN PART and DENY IN PART Plaintiffs' Preliminary Injunction Motion (ECF No. 16).

## I.    BACKGROUND

### A.    Factual Background

This case involves a challenge to a Virginia statute regulating nicotine vapor products that contain liquid nicotine, also known as "electronic nicotine delivery systems" or "ENDS" for short, and commonly referred to as "e-cigarettes" or "vapes." The background, including facts alleged in the Complaint, is as follows.

In 1938, Congress enacted the Federal Food, Drug, and Cosmetic Act ("FDCA" or "the Act"), which created a comprehensive federal framework under the United States Food and Drug Administration ("FDA"). (Compl. ¶ 2); Pub. L. No. 75-717, 52 Stat. 1040 (1938). In 2009, Congress amended the FDCA through the Family Smoking Prevention and Tobacco Control Act ("TCA"), which extended the FDA's regulatory authority to "new tobacco products" and imposed federal approval requirements on such products before they can be sold in the market. 123 Stat. 1776 (2009). While the FDA initially did not classify e-cigarettes and vapes as "new tobacco products," in 2016, it exercised its authority to bring them within the scope of the TCA. (Compl. ¶ 3 (citing 81 Fed. Reg. 29028–29044 (May 10, 2016).) In 2022, Congress further amended the TCA to clarify that "tobacco products" include nicotine derived from "any source," not solely from tobacco. Pub. L. No. 117-103, 136 Stat. 789 (2022) (codified at 21 U.S.C. § 321(rr)(1)); *Wisconsinites for Alts to Smoking & Tobacco, Inc. v. Casey*, 2025 WL 2582099, at *1 (D. Wis. Sept. 5, 2025).

Under the TCA's amendments to the FDCA, manufacturers of "new tobacco products" must submit Premarket Tobacco Product Applications ("PMTAs") and receive authorization from the FDA before introducing those products into the market. (Compl. ¶ 4) (citing *Avail Vapor, LLC v. FDA,* 55 F.4th 409, 414 (4th Cir. 2022)). A "new tobacco product" is any tobacco

product that was not "commercially marketed in the United States as of February 15, 2007." (*Id.*) (citation omitted). As a result, modern vapor products such as vapes generally require PMTA review and authorization before they may be lawfully marketed. (*Id.*)

Due to perceived underenforcement of the FDCA's preauthorization scheme, several states have recently enacted state regulatory frameworks governing new tobacco products. *See Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of Rev.*, 781 F. Supp. 3d 724, 727–28 (S.D. Iowa 2025) ("IAS&T") (addressing constitutional challenge to a similar vape ban law in Iowa); *Casey*, 2025 WL 2582099, at *1 (same, in Wisconsin); *Vapor Tech. Ass'n v. Wooten*, 2025 WL 1787420, at *1 (E.D.N.C. June 27, 2025) (same, in North Carolina); *Vapor Tech Ass'n v. Graham*, 2025 WL 3281428, at *1 (S.D. Miss. Nov. 25, 2025) (same, in Mississippi); *Utah Vapor Bus. Ass'n Inc. v. Utah,* 792 F. Supp. 3d 1226, 1228 (D. Utah 2025) (same, in Utah). These actions by states come against a long historical backdrop of state regulation of tobacco. Of course, "states retain the power to regulate 'matters of health and safety.'" *Northern Virginia Hemp and Agriculture, LLC v. Virginia*, 125 F.4th 472, 484 (4th Cir. 2025) ("Northern Virginia Hemp") (quoting *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997)); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, matters of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (citations omitted) (cleaned up). As far back as 1900, the Supreme Court upheld a Tennessee law banning cigarettes against a commerce clause challenge, characterizing the ban as the kind of legislation that a state may enact "for the preservation of the public health or safety" under its police

powers. *Austin v. Tennessee*, 179 U.S. 343, 349–50 (1900). In the meantime, "state and local governments continue to enact public health measures to respond to the dangers associated with smoking." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1191 (11th Cir. 2017); *see also Consol. Cigar Corp. v. Reilly*, 218 F.3d 30, 39 (1st Cir. 2000), *aff'd in part, rev'd in part sub nom. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (describing the "traditional state authority in matters of public health" and "Congress's relatively recent entry into the regulation of the tobacco industry").

In 2024, the Virginia General Assembly enacted Chapter 23.2 of Title 59.1 of the Virginia Code, codified at Va. Code §§ 59.1-293.10–22, ("Chapter 23.2"), which went into effect on July 1, 2025, and remains scheduled for enforcement beginning on December 31, 2025. (Compl. ¶¶ 1, 24.) Chapter 23.2 establishes a state regulatory framework that, among other directives, commands the Attorney General of Virginia to establish and maintain a directory of liquid nicotine and nicotine vapor products approved for manufacture and sale in the Commonwealth (the "Directory"). Va. Code § 59.1-293.15; (Compl. ¶ 18.) To appear in the Directory, vape manufacturers must provide documentation showing either FDA premarket authorization or that a product is currently under FDA review, with no final decision yet issued. Va. Code § 59.1-293.16; (Compl. ¶ 19.)

Chapter 23.2 prohibits manufacturing, selling or distributing any product not listed in the Directory and authorizes enforcement by the Attorney General, the Department of Taxation and other state law enforcement agencies. Va. Code § 59.1-293.20(A)–(D); (Compl. ¶ 21). Civil penalties of $1,000 per day may be imposed both for offering non-listed products for sale and for failing to cooperate with audits or inspections related to recordkeeping requirements. Va. Code §§ 59.1-293.19–20; (Compl. ¶ 22). The state deposits any revenues from penalties and other

4

funding sources into the "Tobacco Retail Enforcement Fund," administered through the Commonwealth's Department of Taxation. Va. Code § 59.1-293.14; (Compl. ¶ 23.)

Plaintiffs in this case are NOVA Distro, Inc., a manufacturer, wholesale distributor, and retailer of vapes, and Tobacco Hut and Vape Fairfax, Inc., a retailer that sells vapes.[1] (Compl. ¶¶ 27–28). Defendants are the current Virginia Attorney General and Tax Commissioner, respectively, in their official capacities. (Compl. ¶¶ 28–29.)

### B.    Procedural Background

Plaintiffs initiated this action by filing a complaint on October 15, 2025. (ECF No. 1.) Defendants filed a motion to dismiss the Complaint on November 19, 2025. (ECF No. 14.) The following day, Plaintiffs filed the instant Motion for Preliminary Injunction. (ECF No. 16.) The Court ordered an abbreviated briefing schedule concerning Plaintiff's Preliminary Injunction Motion as well as a hearing on both that motion and the pending Motion to Dismiss, acknowledging both the significant constitutional issues presented and the practical necessity of resolving Plaintiffs' claims before Virginia begins enforcing Chapter 23.2 on December 31, 2025. (ECF Nos. 18, 20.)

Plaintiffs allege that several sections of Chapter 23.2 violate the Supremacy Clause of the United States Constitution, because the FDCA impliedly preempts state laws that seek to enforce the Act when Congress has granted the Federal Government exclusive authority to do so. (Compl. ¶¶ 37–43.) Plaintiffs further contend that Chapter 23.2 violates the Virginia Constitution's prohibition on the enactment of "any local, special, or private law" that may

---

[1]    Throughout their briefing, Plaintiffs refer to the largest vape manufacturers in the United States, namely, Juul Labs, Inc., Logic Technology Development, LLC, NJOY, LLC, and R.J. Reynolds Vapor Company collectively as "Big Tobacco." (*See, e.g.,* Compl. ¶ 6.) Plaintiffs refer to "smaller, local" vape manufacturers and retailers collectively as "Small Tobacco." (*See, e.g., id.*)

"[g]ran[t] to any private corporation, association, or individual any special or exclusive right, privilege, or immunity." Va. Const. art. IV, § 14, pt. 18; (Compl. ¶¶ 44–50.) Finally, Plaintiffs allege that Chapter 23.2 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. (Compl. ¶¶ 51–54.) As relief, Plaintiffs seek a preliminary or permanent injunction against Attorney General Miyares and Tax Commissioner Alex in their official capacities, barring (a) the Attorney General from establishing the e-cigarette directory; (b) Defendants from enforcing Va. Code §§ 59.1-293.14–17, 19–21; and (c) the Tax Commissioner from approving Tobacco Retail Enforcement Fund expenditures. (Id. at 18.) Plaintiffs also ask this Court to declare certain sections of Chapter 23.2 unconstitutional under the United States Constitution and/or the Constitution of Virginia and to award Plaintiffs attorneys' fees and court costs.[2] (Id. at 18–19.)

During a December 18, 2025 hearing on the motions, counsel for both parties presented arguments concerning Chapter 23.2's validity, the required showings for preliminary injunctive relief and the public health consequences of the regulatory scheme. The Court provided both parties an opportunity to present additional evidence during the hearing, which both parties declined. Having carefully considered the parties' written and oral presentations, the Court now addresses Defendants' Motion to Dismiss and Plaintiffs' request for preliminary injunctive relief.[3]

---

[2]    The Court construes Plaintiffs' requested declaratory relief to cover Va. Code §§ 59.1-293.14–17 and 19–20.

[3]    During the hearing, the parties indicated that they had agreed to the dismissal of Counts II and III of Plaintiffs' Complaint. The Court nonetheless addresses those Counts and concludes that each warrants dismissal.

## II.    STANDARDS OF REVIEW

### A.    Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), which challenges the Court's jurisdiction over the subject matter of the complaint, may take one of two forms. In a facial challenge, the movant asserts that the complainant has failed "to allege facts on which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). When assessing such a challenge, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural safeguards as he would receive under a Rule 12(b)(6) consideration." *Id.* In a factual challenge, on the other hand, "the defendant challenges the veracity of the facts underpinning subject matter jurisdiction," and the Court "may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). The plaintiff bears the burden of proving subject matter jurisdiction in either instance. *Adams*, 697 F.3d at 1219. The 12(b)(1) motion here contests only legal conclusions, not the facts asserted by Plaintiffs. The Court therefore grants Plaintiffs' pleadings the same procedural protections of a 12(b)(6) motion in its analysis.

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to

"'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47

(1957)). As the Supreme Court opined in *Twombly*, a complaint must state "more than labels

and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law

does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual

allegations must be enough to raise a right to relief above the speculative level," rendering the

right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint

must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at

557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v.*

*E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

### 2.    Preliminary Injunction

"Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary

restraining orders and preliminary injunctions." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728

(E.D. Va. 2017). "A preliminary injunction is 'an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F.

App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008)). Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24. "[G]ranting

a preliminary injunction requires that a district court, acting on an incomplete record, order a

party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital*

*Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citation omitted). Therefore, preliminary

injunctions are "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

"To obtain a preliminary injunction, a party must show:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) an injunction is in the public interest." *Northern Virginia Hemp*, 125 F.4th at 492 (citing *Real Truth About Obama, Inc. v. Fed. Election Comm'n ("Real Truth")*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010)).  "Where, as here, the government is a party, the 'balance of the equities' and 'public interest' prongs of the preliminary injunction test merge." *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 357 (S.D. W. Va. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The party seeking a preliminary injunction bears the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346.  The proponent must demonstrate each factor by a "clear showing." *Winter*, 555 U.S. at 22.  The failure to show any one of the relevant factors mandates denial of the motion for a preliminary injunction. *Real Truth*, 575 F.3d at 346.

### III.    ANALYSIS

Plaintiffs raise three counts in their Complaint against Defendants, alleging the following violations of law:  (I) a violation of the Supremacy Clause of the United States Constitution, because the FDCA preempts Chapter 23.2; (II) a violation of Virginia's prohibition against the enactment of special laws pursuant to Article IV, Section 14, Part 18 of the Constitution of Virginia; and (III) a violation of the Fourteenth Amendment's Equal Protection Clause.  (Compl.

¶¶ 37–54.)  In their Preliminary Injunction Motion, Plaintiffs pursue only the federal preemption and Virginia Constitution claims.  (ECF No. 16 ¶ 3.)  Defendants Motion to Dismiss, in turn, seeks dismissal of all three claims on a variety of grounds, including lack of Article III standing and lack of the Court's jurisdiction over Count II due to sovereign immunity.  (ECF No. 15 at 10–11.)[4]  Because federal courts must generally confirm their jurisdiction before addressing the merits of any arguments raised, the Court first considers these threshold issues before evaluating Plaintiffs' request for injunctive relief.  *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

### A.    Standing

Defendants contend that Plaintiffs lack standing, which raises the issue of this Court's subject matter jurisdiction.  (ECF No. 21 at 19–20.)  To possess Article III standing, a plaintiff must have (1) an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a remedy.  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  To establish an injury in fact, plaintiffs "must show that [they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc,* 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Defendants' argument that Plaintiffs lack standing to bring this suit hinges on *Lujan*'s use of the phrase "legally protected interest." (ECF No. 15 at 19.)  According to Defendants, Plaintiffs are not seeking a remedy for a legally protected interest, because the sale of

---

[4]    The Court employs the pagination assigned to the parties' various filings by the CM/ECF system.

unauthorized vapes is already prohibited under the FDCA and these products therefore cannot be introduced into interstate commerce. (*Id.* (citing 21 C.F.R. § 1114.5).)  However, as other courts have articulated, such a strict reading of *Lujan's* "legally protected interest" standard would lead to an "anomalous result" in the context of Supremacy Clause challenges, such as in this case. *IAS&T*, 781 F. Supp. 3d at 734; *see also Casey*, 2025 WL 2582099, at *4 (arriving at the same conclusion); *Wooten*, 2025 WL 1787420, at *4 (finding that such a reading of *Lujan* "distorts the Supreme Court's standing jurisprudence").  When Congress has the authority to define the scope of state regulatory power, courts must be able to assess whether a state has exceeded those bounds.  If standing turned on a plaintiff's perfect adherence to the federal requirements, states could sidestep preemption review simply by pointing to an alleged violation of the very federal standards they may be forbidden to enforce. *IAS&T*, 781 F. Supp. 3d at 734.  The Supreme Court previously rejected the "legal right" theory of standing, *Ass'n of Data Processing Servs. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970), and the *Lujan* court declined to revive it.  The Court therefore rejects Defendants' argument based on their interpretation of the term "legally protected interest."

The Court finds that Plaintiffs have established Article III standing here.  First, the enforcement of Chapter 23.2 will inflict concrete and significant economic harms on Plaintiffs, including lost sales, loss of customers, sunk inventory, and the imminent loss of access to alternative products to traditional cigarettes as well as the imminent enforcement penalties taken by the Commonwealth.  (ECF No. 17 at 22–23; ECF No. 21 at 12.)  Further, Plaintiff's harms are both imminent and plainly attributable to the statute's enforcement.  On December 31, 2025, Virginia will forbid and attach penalties to the sale of any vapes not listed on the Attorney General's Directory.  (ECF No. 19 at 14); Va. Code § 59.1-293.20(A).  If enforcement were to

11

be halted, Plaintiffs could continue selling their products and would avoid these revenue losses, rendering the harm redressable by a Court decision in this matter. As such, the Court finds that Plaintiffs satisfy the requirements for Article III standing.

### B.    Virginia Constitution and Sovereign Immunity

The Court proceeds to consider Defendants' Motion to Dismiss as to Count II of Plaintiffs' Complaint on jurisdictional grounds. Plaintiffs allege that Chapter 23.2 violates the Virginia Constitution's prohibition on the enactment of "any local, special, or private law" that may "[g]ran[t] to any private corporation, association, or individual any special or exclusive right, privilege, or immunity." (Compl. ¶ 45 (quoting Va. Const. art. IV, § 14, pt. 18).) To be "special" in a constitutional sense, a law must "arbitrarily separate[] some persons, places or things from those upon which, but for such separation, it would operate." *Green v. Cnty. Bd. of Arlington Cnty.*, 68 S.E.2d 516, 518 (Va. 1952). "Though an act be general in form, if it be special in purpose and effect, it violates the spirit of the constitutional prohibition." *Riddleberger v. Chesapeake W. Ry.*, 327 S.E.2d 663, 666 (Va. 1985). Plaintiffs argue that, though Chapter 23.2 was drafted in a "seemingly 'general' and innocuous form," it nonetheless creates a "special purpose and effect . . . in violation of the Constitution of Virginia," because it "statutorily enshrined [] Big Tobacco's monopoly" by creating a system where only deep-pocketed, large-scale vape producers who can afford to comply with FDA requirements will be able to access the market. (Compl. ¶ 49.)

Defendants move to dismiss Count II on several grounds, including Eleventh Amendment sovereign immunity. Since Plaintiffs sue Virginia's Attorney General and Tax Commissioner in their official capacities, Defendants argue that sovereign immunity bars this claim unless one of three exceptions applies: Virginia waived its immunity, Congress validly abrogated Virginia's

12

immunity, or the *Ex parte Young* exception applies. (ECF No. 15 at 25–26.) In Defendants'

telling, Plaintiffs fail on all three fronts. According to Defendants, nothing about Article IV,

§ 14's text suggests waiver, nor do Plaintiffs point to any federal statutes evincing Congressional

intent to abrogate immunity as to this provision. (ECF No. 15 at 26; ECF No. 21 at 30.) Finally,

Defendants argue that, because *Ex parte Young* does not apply where plaintiffs sue state

defendants for compliance with state (rather than federal) law, Plaintiffs fail to establish this

exception as well, rendering their claim barred by sovereign immunity. (ECF No. 21 at 30–31.)

The Court agrees with Defendant's arguments and will dismiss Plaintiffs' Count II on

sovereign immunity grounds. This Court recently confronted a similar challenge based on a

different provision of the Virginia Constitution in *Goldman v. Northam*, 566 F. Supp. 3d 490,

507 (E.D. Va. 2021), *vacated on other grounds*, 41 F.4th 366 (4th Cir. 2022). There, the Court

dismissed the plaintiff's Virginia Constitution-based challenge on sovereign immunity grounds,

rejecting Plaintiff's *Ex parte Young* and waiver arguments as follows:

> Plaintiff's argument overlooks the purpose of the *Ex parte Young* exception. That
> doctrine exists to provide an exception to sovereign immunity only in cases of
> ongoing violations of federal — not state — law. *Pennhurst State Sch. & Hosp.
> v. Halderman*, 465 U.S. 89, 106 (1984). "*Ex parte Young* was the culmination of
> efforts by this Court to harmonize the principles of the Eleventh Amendment with
> the effective supremacy of rights and powers secured elsewhere *in the
> Constitution*." *Perez v. Ledesma*, 401 U.S. 82, 106 (1971) (Brennan, J.,
> concurring in part and dissenting in part) (emphasis added). Count Two alleges a
> violation of the Virginia Constitution, and consequently, the Court cannot redress
> that claim under the *Ex parte Young* exception.
>
> Moreover, the Commonwealth has not waived sovereign immunity as to claims of
> violations of Article II, § 6-A of the Virginia Constitution. "The test for
> determining whether a State has waived its immunity from federal-court
> jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234,
> 241 (1985). "[A] State's constitutional interest in immunity encompasses not
> merely whether it may be sued, but where it may be sued . . . for a state statute or
> constitutional provision to constitute a waiver of Eleventh Amendment immunity,
> it must specify the State's intention to subject itself to suit in *federal court*." *Id.* at

241 (alterations in original) (internal citation and quotation marks omitted). "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [a court] will find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (citation and internal quotation marks omitted).

Nowhere in the Virginia Constitution does Virginia consent to suit in federal court. *Lighthouse Fellowship Church v. Northam*, 515 F. Supp. 3d 384, 399 (E.D. Va. 2021). Furthermore, Plaintiff cites no Virginia Supreme Court decisions indicating that the Commonwealth has waived sovereign immunity from suit in federal court on state constitutional claims, nor has the Court discovered any. *See id.* (finding in suit against Virginia governor that the parties and that court had not located any state supreme court decisions waiving Eleventh Amendment immunity in federal court on state constitutional claims) [. . . ] Without more, the Court cannot find that Virginia waived its sovereign immunity as to the provisions of the Constitution of Virginia under which Plaintiff sues, and therefore, must dismiss Count Two of the Second Amended Complaint.

*Goldman*, 566 F. Supp. 3d at 507–08.

In their opposition to Defendants' Motion to Dismiss, Plaintiffs focus on the *Ex parte Young* exception. Plaintiffs seek to avoid *Pennhurst*'s clear prohibition against suits in federal court against state officials that seek enforcement of *state* law provisions by arguing, in essence, that Plaintiffs seek to enforce federal law. As Plaintiffs put it, "the Vape Ban incorporates federal law (*i.e.* the FDA's product regulations) but runs afoul of the Supremacy Clause, raising questions that are fundamentally matters of federal law in addition to violating the ban on 'special laws' under the Virginia Constitution." (ECF No. 19 at 26.) Or stated differently, "Plaintiffs are seeking to enforce federal law, not state law because the legal rule Plaintiffs seek to address stems from federal law." (*Id.* at 28.)

Yet, as this Court already explained in *Goldman*, *Ex parte Young* provides an exception to immunity "only in cases of ongoing violations of federal — not state — law." 566 F. Supp. 3d at 507. In Count II, Plaintiffs allege that Chapter 23.2 violates state, not federal, law. Plaintiffs' argument that their state law claim "stems from federal law" fails to alter that picture.

14

As in *Goldman*, Plaintiffs here "allege[] a violation of the Virginia Constitution, and consequently, the Court cannot redress that claim under the *Ex parte Young* exception." *Id.*

Plaintiffs' claim that Virginia implicitly waived sovereign immunity for alleged violations of Article IV, Section 14 of the Virginia Constitution similarly fails. Plaintiffs assert that Article IV, Section 14 "is self-executing," and cite *DiGiacinto v. Rector & Visitors of George Mason University*, 704 S.E.2d 365 (Va. 2011), for the proposition that "sovereign immunity does not preclude declaratory and injunctive relief claims based on self-executing provisions of the Constitution of Virginia." (ECF No. 22 at 23; ECF No. 17 at 9 (citing *DiGiacinto*, 704 S.E.2d at 371).) However, *DiGiacinto* involved proceedings in Virginia state court, not federal court. 704 S.E.2d at 367. That distinction proves fatal to Plaintiffs' argument. As this Court pointed out in *Goldman*, courts will find waiver of state sovereign immunity for federal court purposes "only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Goldman*, 566 F. Supp. 3d at 508 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). Given that "[n]owhere in the Virginia Constitution does Virginia consent to suit in federal court," and given no "overwhelming implications" to the contrary, Plaintiffs' argument fails on these grounds as well. *Id.*

For all of these reasons, and having failed to establish a valid exception to Eleventh Amendment sovereign immunity, Plaintiffs' claim that Chapter 23.2 violates the Virginia Constitution stands barred by sovereign immunity. The Court will therefore dismiss Count II of Plaintiffs' Complaint.

15

### C.    Merits

The Court proceeds to consider the pending motions as they relate to the remaining counts, Counts I and III.  The Court begins by considering Plaintiffs' equal protection claim in the context of Defendants' Motion to Dismiss.[5]  The Court then proceeds to consider Plaintiffs' federal preemption claim, both in the context of Defendants' Motion to Dismiss and Plaintiffs' Preliminary Injunction Motion.

#### 1.    Count III:  Equal Protection Clause

Plaintiffs allege that Chapter 23.2 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution on the basis that it discriminates against small tobacco companies without a rational basis.  (Compl. ¶¶ 51–53.)  The Fourteenth Amendment provides that "[N]o state shall. . .  deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "[T]o survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus."  *Equity in Athletics v. Dep't of Educ.,* 639 F.3d 91, 108 (4th Cir. 2011).  If the plaintiff was treated differently than those similarly situated, but the differential treatment does not implicate a protected suspect class, the law must only survive rational-basis review to pass constitutional muster.  *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) (listing the protected suspect classes as including race, religion or alienage).

---

[5]    Since Plaintiffs do not rely on their equal protection claim for purposes of their Preliminary Injunction Motion, the Court will not consider this claim in that context.

Here, the parties agree that the appropriate level of constitutional scrutiny consists of rational basis review, because no fundamental right or suspect classification that would trigger heightened scrutiny stands at issue. (Compl. ¶ 53; ECF No. 15 at 28.) Under rational basis review, the classification in the challenged law must be "rationally related to a legitimate state interest" to survive judicial review. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see also Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (finding that, unless a classification "violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender," the law does not violate the Equal Protection Clause so long as the state has any rational basis for the classification that it draws.) The Court recognizes that no fundamental constitutional right to sell tobacco products exists and Plaintiffs, as sellers and manufacturers of certain vape products, do not fall within a suspect classification. Thus, rational basis review constitutes the appropriate level of constitutional scrutiny here.

a.    *Similarly Situated Prong*

Although the parties fail to address the first prong of the equal protection analysis, the Court begins with an examination of whether Plaintiffs "ha[ve] been treated differently from others with whom [they are] similarly situated." *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 112 (4th Cir. 2023). A proposed comparator is "similarly situated" if that comparator is similar in ways relevant to the goal of the law at issue, here Virginia's Chapter 23.2 statute. *Id.* at 102, 113; *see also Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992) (finding that the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike").

The Court finds that Plaintiffs fail to establish that they are treated differently from similarly situated comparators. The Court infers from the Complaint that Plaintiffs identify as

comparators larger, nationally established vape manufacturers whose products have received federal premarket authorization. (Compl. ¶¶ 6–7.)[6] Both Plaintiffs and their larger competitors operate in the same industry, sell similar products in Virginia, and stand subject to the same statutory frameworks governing federal premarket approval of vapes. Although some of these larger competitors have obtained federal authorization while Plaintiffs and other similarly sized businesses have not, that distinction is the very distinction drawn by the challenged statute and therefore cannot define away comparator status at the outset of the analysis. As such, the Court finds that Plaintiffs and larger vape companies are "similarly situated" for Equal Protection purposes. *Alive Church,* 59 F.4th at 113. However, Plaintiffs fail to establish disparate treatment. Chapter 23.2 applies the same standards to all manufacturers: products may be sold in Virginia if they satisfy the FDA's premarket authorization requirements. The statute does not impose different rules on different classes of manufacturers or retailers based on size or any other objective metric. That some manufacturers have obtained federal authorization while others have not reflects different companies' differing degrees of compliance with uniform regulatory requirements, rather than unequal treatment by Virginia. Plaintiffs' Equal Protection claim thus fails for lack of disparate treatment.

### b. Rational Basis Review

Even if Plaintiffs could establish that they were treated differently from others similarly situated, the Court finds that Plaintiffs also cannot meet their heavy burden of demonstrating that

---

[6]     Plaintiffs' claims stand premised on the disproportionate impacts that the disputes sections of Chapter 23.2 will have on the largest vape manufacturers ("Big Tobacco") versus smaller, local vape manufacturers and retailers ("Small Tobacco"). (Compl. ¶ 6.) According to Plaintiffs, because of the significant costs involved in applying for federal pre-market authorization, the only products that have received PMTAs are products produced by "Big Tobacco." (*Id.* ¶ 8.)

Chapter 23.2 fails rational basis review. To prevail on rational basis review, Plaintiffs must demonstrate that the classification that they challenge is not "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. Under this highly deferential standard, courts uphold a classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Laws bear "a strong presumption of validity," and those challenging a law's rationality bear the burden "to negat[e] every conceivable basis which might support it." *Id.* at 314–15 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The Court finds that Plaintiffs have not met this heavy burden. Defendants argue that the Commonwealth has a rational basis for prohibiting the sale of vapes in Virginia that have not obtained FDA approval, as the "Commonwealth has a legitimate governmental interest in protecting the health and welfare of its people." (ECF No. 15 at 30) (citing *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023) (per curiam)). Defendants cite to research demonstrating that vapes have been shown to attract new users, including adolescents who otherwise would not have initiated nicotine use. (*Id.* at 14, 30) (citing U.S. Dep't of Health & Hum. Servs., E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General 186 (2016), https://stacks.cdc.gov/view/cdc/44007 [https://perma.cc/YTC4-TQPP] ("HHS, E-Cigarette Use Among Youth & Young Adults"); Press Release, Centers for Disease Control and Prevention, U.S. E-cigarette Sales Climbed During 2020-2022 (June 22, 2023), https://www.cdc.gov/media/releases/2023/p0622-ecigarettes-sales.html [https://perma.cc/US9Z-9S5H]). Defendants also refer to research suggesting that vapes pose particular health risks, including harm to the developing brains, lungs and cardiovascular systems of teenagers. (*Id.* (citing HHS, E-Cigarette Use Among Youth and Young Adults, at 5, 6).) Finally, Defendants

highlight that unregulated vapes may contain certain toxic substances that have led to numerous

hospitalizations and even deaths. (*Id.* at 13 (citing Colby Strong, Vaping Hospitalizations

Remained High Even After CDC Stopped Tracking EVALI, Pulmonology Advisor (May 23,

2024), https://www.pulmonologyadvisor.com/reports/vaping-evali-hospitalizations-

high/#:~:text=Hospitalizations%20due%20to%20e-cigarette%2Fvaping%20use-

associated%20lung%20injury%20%28EVALI%29,in%20San%20Diego%2C%20California%2C

%20May%2017%20to%2022 [https://perma.cc/8FS3-TAT5]).) On the basis of these scientific

findings, the Court agrees that Virginia has a legitimate interest in protecting the health of its

citizens, especially younger people, by regulating unauthorized vape products.

Plaintiffs, in response, argue that any rational basis for regulating vape products that have

not obtained FDA approval is "pretextual," suggesting that the federal scheme and the state

legislative enactment benefit large, more established tobacco manufacturers and that "there is

little consistency in determining which products may be offered for sale as the FDA has

permitted Big Tobacco to sell a wide range of flavored nicotine products and even menthol-

flavored vapes." (ECF No. 19 at 29.) The Court stands unpersuaded by this argument. As the

Supreme Court noted, "it is entirely irrelevant for constitutional purposes whether the conceived

reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508

U.S. at 315 (citation omitted). Because Virginia's classification advances a legitimate interest in

protecting the public health of its citizens, the Court upholds its validity under the Equal

Protection Clause irrespective of any underlying legislative motivations.

In sum, since Plaintiffs fail to show that they are treated differently from similarly

situated comparators and that the challenged classification lacks a rational relationship to

a legitimate state interest, Plaintiffs' equal protection claim fails.  The Court will therefore dismiss Count III of Plaintiff's Complaint.

### 2.    Count I:  Federal Preemption

Plaintiffs contend that the FDCA preempts the disputed sections of Chapter 23.2 through both obstacle and express preemption.  Specifically, Plaintiffs first argue that Virginia's law stands as an obstacle to the accomplishment of federal objectives by interfering with the FDA's statutory authority to enforce the FDCA according to its own priorities and timelines.  Plaintiffs also argue that the TCA's Preemption clause expressly preempts the relevant provisions of Chapter 23.2.  The Court begins by reviewing the principles governing preemption before turning to the legal framework at issue in this case.

### a.    Law on Preemption

The Supremacy Clause of the United States Constitution declares that "the Laws of the United States" constitute "the supreme Law of the Land."  U.S. Const. art. VI.  In effect, federal law "preempts — or bars — claims under state law that either interfere with or are contrary to federal laws."  *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023).  In evaluating claims of preemption, courts begin with the background presumption that Congress generally "does not intend to displace state law."  *S. Blasting Serv., Inc. v. Wilkes Cnty*, 288 F.3d 584, 589 (4th Cir. 2002) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  That presumption extends where "Congress legislates 'in a field which the States have traditionally occupied.'"  *Id.* at 590 (quoting *Medtronic*, 518 U.S. at 485).

Preemption may be either express or implied.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).  When Congress includes an express preemption clause, the analysis begins with the clause's plain language.  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Where, as here, implied preemption is also alleged, courts examine whether "the state law stands

as an obstacle to the accomplishment of the full purposes and objectives of Congress."

*Silkwood*, 464 U.S. at 248.  State laws that would "prevent or frustrate" such objectives are

"nullified" under the Supremacy Clause.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873

(2000).  This implied preemption inquiry requires judgment "informed by examining the federal

statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign*

*Trade Council*, 530 U.S. 363, 373 (2000).

The "touchstone" of preemption analysis is thus congressional intent.  *IAS&T*, 781 F.

Supp. 3d at 731 (citing *Medtronic*, 518 U.S. at 485).  When Congress acts in an area historically

regulated by the States, such as tobacco regulation, the court proceeds "with the assumption that

the historic police powers of the States [are] not to be superseded by the Federal Act unless that

was the clear and manifest purpose of Congress."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77

(2008) (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

(1947)).  The Supreme Court has cautioned that implied preemption analysis should not become

"a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,"

so as to "undercut the principle that it is Congress rather than the courts that pre-empts state

law."  *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).  Here,

Congress' intent must be gleaned from the text of the FDCA.

> b. *Federal Regulatory Scheme For Vape Products*
>
> (i)    The FDCA and TCA:  Overview of Relevant Substantive
> and Enforcement Provisions

Congress enacted the FDCA in 1938 to establish a federal system for regulating products

introduced into interstate commerce.  Pub. L. No. 75-717, 52 Stat. 1040 (1938).  The statute

authorizes the Food and Drug Administration ("FDA") to evaluate the safety, labeling and

marketing of drugs, medical devices and other regulated products before they are allowed in the market. 21 U.S.C. §§ 331–360.  At its core, the FDCA prohibits the introduction of adulterated or misbranded products, requires manufacturers to submit evidence demonstrating safety and effectiveness (where applicable) and empowers the FDA to determine whether a product may be lawfully sold. 21 U.S.C. §§ 351–352, 355.

Congress amended the FDCA in 2009 when it passed the TCA, extending the FDA's regulatory authority to "new tobacco products" and requiring such products to obtain approval before being sold in the market.  123 Stat. 1776 (2009).  The FDA classified vapes as "new tobacco products" in 2016, bringing them within the FDCA and TCA's scope.  81 Fed. Reg. 29028-29044 (May 10, 2016).  In 2022, Congress amended the FDCA to clarify that "tobacco products" include products where consumers derive nicotine from "any source," not solely from tobacco.  Pub. L. No. 117-103, 136 Stat. 789 (2022) (codified at 21 U.S.C. § 321(rr)(1)).  Courts have universally recognized that this amendment renders the FDCA directly applicable to vape products. *See, e.g., U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428, 430 (2d Cir. 2013); *Casey*, 2025 WL 2582099, at *1; *Wooten*, 2025 WL 1787420, at *1; *IAS&T*, 781 F. Supp. 3d at 728.

According to FDA regulations, "[a] new tobacco product may not be introduced or delivered for introduction into interstate commerce" unless the FDA issues a "marketing granted order." 21 C.F.R. § 1114.5.  To obtain such authorization, a manufacturer must submit a premarket tobacco product application ("PMTA"), supported by "valid scientific evidence" showing that the product is "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(5)(A), (B).  In evaluating a premarket authorization application, the FDA considers, among other criteria, "the increased or decreased likelihood that existing users of tobacco

products will stop using such products" and "the increased or decreased likelihood that those who do not use tobacco products will start using such products." § 387j(c)(4)(A), (B).[7]

When Congress enacted the FDCA in 1938, it critically vested enforcement authority exclusively in the federal government. 21 U.S.C. § 337(a). According to § 337(a), "all such proceedings for the enforcement, or to restrain violations" of the FDCA "shall be by and in the name of the United States." *Id.* The Supreme Court has recognized the language of § 337(a) as reflecting Congress's clear intent to keep FDCA enforcement exclusively federal. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349, 352 (2001) (holding, in the context of the FDCA's Medical Device Amendment, that § 337(a) constitutes "clear evidence that Congress intended" for the FDCA to "be enforced exclusively by the Federal Government").

<center>(ii)    The FDCA / TCA and Preemption</center>

In enacting the TCA, Congress sought to address the legality of state and local regulation of tobacco products through "a carefully structured preemption scheme" containing a Preservation Clause (21 U.S.C. § 387p(A)(l)), a Preemption Clause (21 U.S.C. § 387p(a)(2)(A)) and a Savings Clause (21 U.S.C. § 387p(a)(2)(B)). *IAS&T*, 781 F. Supp. 3d at 736. The so-called "Preservation Clause" states, in relevant part:

> Except as provided in paragraph (2)(A), nothing in this subchapter . . . shall be construed to limit the authority of a . . . State or political subdivision of a State . . . [to] enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter . . . relating to or prohibiting the sale, distribution, possession, . . . or use of tobacco products by individuals of any age, [or] information reporting to the State . . . .

---

[7]    According to the Complaint, obtaining FDA authorization requires expenditures averaging $466,563 and rising as high as $2.5 million per vape product, which Plaintiffs allege has historically made such authorization financially attainable only for the largest tobacco firms. (Compl. ¶ 48.)

21 U.S.C. § 387p(A)(l).  Notably, § 387p(A)(l)'s preservation of authority allows states to

enforce regulations on the sale, distribution, possession or use of tobacco products that *exceed*

federal requirements.  However, later in the same section, Congress, in turn, limits this clause

with a Preemption Clause, which provides as follows:

> No State or political subdivision of a State may establish or continue in effect
> with respect to a tobacco product any requirement which is different from, or in
> addition to, any requirement under the provisions of this subchapter relating to
> tobacco product standards, premarket review, adulteration, misbranding, labeling,
> registration, good manufacturing standards, or modified risk tobacco products.

21 U.S.C. § 387p(a)(2)(A).  Finally, the TCA included a so-called Savings Clause, providing an

exception to the Preemption Clause.  It states:

> Subparagraph (A) does not apply to requirements relating to the sale, distribution,
> possession, information reporting to the State, exposure to, access to, the
> advertising and promotion of, or use of, tobacco products by individuals of any
> age, or relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a)(2)(B).

The TCA did not amend § 337(a) of the FDCA, which continues to provide that "all such

proceedings for the enforcement, or to restrain violations" of any FDCA provisions "shall be by

and in the name of the United States."  21 U.S.C. § 337(a).

> (iii)    How courts have interpreted the relevant provisions that
> concern preemption (§ 337(a) and § 387(p)).

Courts addressing the preemptive scope of § 337(a) and § 387(p) have generally

confirmed that while states retain some regulatory authority over tobacco products, that authority

does not grant states enforcement authority over the FDCA.  The Supreme Court and lower

courts have found that enforcement authority over FDCA provisions and requirements remains

exclusively in federal hands.

In *Buckman Company v. Plaintiffs' Legal Committee*, the Supreme Court considered

claims that a medical device manufacturer had made fraudulent representations to the FDA

25

during its premarket review process. 531 U.S. at 343–44. The Court held that such claims could not be pursued under state law, as this would require private litigants to enforce the FDCA's approval process, a role Congress solely reserved to the FDA through § 337(a). *Id.* at 349 n.4, 352–53. The Court explained that this enforcement power remained unaltered by the presence of related state-law regimes, finding that § 337(a)'s text constitutes "clear evidence that Congress intended" compliance to be secured solely by the federal government. *Id.* at 352.

Courts have applied the Supreme Court's interpretation of § 337(a)'s exclusivity mandate beyond the specific context at issue in *Buckman* to the FDCA's regulatory framework at large. The First Circuit recently held that where a state-law claim exists "solely by virtue" of an FDCA violation, it falls within the enforcement authority reserved solely to the federal government. *Plourde v. Sorin Grp. USA, Inc.,* 23 F.4th 29, 33 (1st Cir. 2022). Similarly, the Ninth Circuit held that actions taken to address noncompliance with FDCA requirements "must be by and in the name of the United States." *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.,* 48 F.4th 1040, 1049 (9th Cir. 2022).

As to the TCA's preemption scheme, courts have held that the three provisions at issue reflect congressional recognition of the "extensive background of state and local tobacco regulation" and a deliberate choice not to "broadly jettison[] the longstanding tradition of states and localities' role in the regulation of sales of tobacco products when it enacted the TCA in 2009." *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 549–50 (9th Cir. 2022); *see also City of Edina*, 60 F.4th at 1176 (arriving at similar conclusion)*; Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 79 (1st Cir. 2013) (same); *Smokeless Tobacco*, 708 F.3d at 432 (same). However, "analyzing these clauses together leaves room to argue about Congress's actual intent to preempt States' laws" and the interplay between these

provisions and the federal enforcement authority of FDCA provisions, including those governing

tobacco, under § 337(a) and *Buckman*. *Casey*, 2025 WL 2582099, at *5.

<div align="center">

*c.*      *Virginia's Chapter 23.2*

</div>

Plaintiffs challenge seven sections of Chapter 23.2:  Va. Code § 59.1-293.14 ("Tobacco

Retail Enforcement Fund"); Va. Code § 59.1-293.15 ("Liquid nicotine and nicotine vapor

product; directory"); Va. Code § 59.1-293.16 (Liquid nicotine and nicotine vapor product;

certification; penalty"); Va. Code § 59.1-293.17 ("Removal or exclusion from directory"); Va.

Code § 59.1-293.19 ("Recordkeeping; audits, inspections, and investigations; penalties"); Va.

Code § 59.1-293.20 ("Sale or distribution prohibited"); and Va. Code § 59.1-293.21

("Enforcement; inspection").  The Court provides a brief overview of each statutory section.

Section 59.1-293.14 establishes a special nonreverting fund to finance Virginia's tobacco

retail licensing and enforcement activities.  Va. Code § 59.1-293.14.  This section governs the

receipt, management and expenditure of funds and authorizes their use for administrative costs,

education and training, retail inspections and compliance checks conducted pursuant to other

provisions of Virginia law.  *Id.*

Section 59.1-293.15 directs the Attorney General to establish and maintain a public

directory listing vape manufacturers and vape products that are in compliance with the remaining

substantive provisions of Chapter 23.2.  Section 59.1-293.16, in turn, sets forth these substantive

requirements for inclusion in the Directory.  Subsection A requires manufacturers to certify that

each product sold in the Commonwealth has either (1) received FDA marketing authorization or

(2) is pending FDA review.  Va. Code. § 59.1-293.16(A)(1)–(2).  Subsections B and C require a

separate certification for each product, accompanied by copies of FDA authorization orders or

evidence of pending FDA review, as well as associated fees.  *Id.* § 59.1-293.16(B), (C).

<div align="center">27</div>

Subsection D further requires manufacturers to notify the Attorney General of any material change in FDA authorization status. *Id.* § 59.1-293.16(D).

Section 59.1-293.17, entitled "Removal or exclusion from directory," authorizes the Attorney General to remove or exclude manufacturers or products from the Directory for failure to comply with the above certification requirements. *Id* § 59.1-293.17(A). The statute establishes notice procedures and provides a limited opportunity for manufacturers to demonstrate compliance. *Id.* § 59.1-293.17(B). Significantly, where a product is removed from the Directory, retailers, distributors and wholesalers must sell remaining inventory within a specified period or otherwise remove it from commerce, after which the product becomes subject to seizure, forfeiture and destruction. *Id.* § 59.1-293.17(D).

Section 59.1-293.19, in turn, addresses recordkeeping and inspection requirements for persons who receive, store, sell, handle or transport vape products. *Id* § 59.1-293.19(A). It requires the preservation of records relating to the purchase, sale, and distribution of such products and authorizes audits, inspections, investigations and penalties to enforce those recordkeeping and auditing obligations. *Id.* § 59.1-293.19(B)–(D).

Sections 59.1-293.20 and 21, by contrast, govern market access and enforce Chapter 23.2's Directory requirement. Beginning December 31, 2025, Section 59.1-293.20 prohibits the sale, distribution or importation for resale of any vape product unless that product is included in the Attorney General's Directory. Va. Code § 59.1-293.20(A)–(B). The section imposes civil penalties for each day that a noncompliant product remains on the market and establishes timelines for retailers, wholesalers and distributors to remove products not listed in the Directory from inventory. *Id.* § 59.1-293.20(C)–(F). Section 59.1-293.21 in turn authorizes civil actions by state and local prosecutors, empowers courts to issue injunctions and order forfeiture, and

subjects retailers and wholesalers to compliance checks conducted by the Attorney General. *Id.* § 59.1-293.21(A)–(D).

> d.    *Analysis*

Plaintiffs advance two distinct preemption arguments. First, and principally, Plaintiffs contend that the challenged sections of Chapter 23.2 operate as a state mechanism that enforces federal product requirements, thereby displacing the FDA's exclusive powers. (Compl. ¶¶ 39–42.) Under this theory, Chapter 23.2 is impliedly preempted, because it intrudes upon enforcement authority that Congress reserved solely to the federal government. (*Id.* ¶ 40.) Second, Plaintiffs argue in the alternative that Chapter 23.2 is expressly preempted under the TCA's Preemption Clause, as the statute functions in the domain of "tobacco product standards" and "premarket review," areas that the TCA expressly assigns to the federal government. (ECF No. 19 at 19–21.)

By contrast, Defendants view Chapter 23.2 not as enforcing federal standards, but as a permissible exercise of state police power to regulate tobacco products. (ECF No. 15 at 25.) Relying on the Preservation and Savings Clauses in 21 U.S.C. § 387p, Defendants argue that Congress explicitly contemplated states imposing requirements "in addition to or more stringent than" federal regulation, including restrictions on market access. (ECF No. 21 at 25.) Defendants characterize Chapter 23.2 as falling within the Preservation and Savings Clauses' directive for states to retain the authority to enact and enforce such additional requirements for the sale of tobacco products. (*Id.* at 27.) Accordingly, Defendants assert that Chapter 23.2 does not conflict with federal enforcement powers and is not preempted by the TCA's Preemption Clause. (*Id.* at 28.)

The parties' disagreement thus distills to whether Chapter 23.2 lawfully falls within Virginia's preserved authority under § 387p (and thus stands unpreempted by the FDCA) or unlawfully enforces federal authorization standards that § 337(a) assigns solely to the FDA. The Court proceeds to resolve this dispute by construing the relevant statutes and applying them to Chapter 23.2.

(i)    Court's construction of the relevant statutes

The Court begins by construing the effect of the three relevant clauses of § 387p and determining what state authority they preserve and preempt. Upon considering the plain text of these clauses, the Court construes their effect as follows. The Preservation Clause expressly reserves the right of states to craft their own tobacco regulations that are "in addition to, or more stringent" than federal requirements. 21 U.S.C. § 387p(a)(1). While the Preemption and Savings Clauses expressly preempt states from imposing requirements "different from, or in addition to" federal requirements as to certain aspects of tobacco regulation, states may impose their own requirements "different from, or in addition to" federal requirements as to sale, distribution or possession of new tobacco products. 21 U.S.C. § 387p(a)(2)(A)–(B).

Significantly, however, all three § 387p provisions address only state regulations that are either "in addition to," "more stringent than" or "different from" federal requirements. Nothing in the text of these provisions suggests that Congress intended to permit states to create or enforce regulations that are *identical to*, or that solely incorporate, federal requirements. In addition, while the Savings Clause clarifies that preemption of requirements different from or in addition to federal requirements shall not extend to state requirements that relate to sale, distribution or possession of tobacco products, the Preemption Clause makes clear that preemption *does* apply to additional state requirements that relate to tobacco product standards.

Finally, nothing in the text of these provisions addresses or in any way abrogates § 337(a)'s exclusive grant of enforcement authority of the FDCA and regulations promulgated thereunder to the federal government or *Buckman*'s clear reinforcement of that exclusively federal authority. Stated more simply: Section 387p expressly exempts certain types of state tobacco regulations from federal preemption, but only if they involve measures that are different from existing federal requirements, and *not* if they involve tobacco product standards. State regulations involving measures different from existing federal requirements that concern tobacco sales, however, are not preempted by the FDCA.

Two basic canons of statutory interpretation support the Court's reading. Under the *expressio unius* canon, "expressing one item of an associated group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (citations omitted). This instructive tool applies when "circumstances support[] a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002). Under this well-established canon, when Congress specifies that states may enact requirements "in addition to," "more stringent than" or "different from" federal requirements, the omission of "identical to" or "premised on," for example, indicates that Congress did not intend to permit states to implement, and thereby enforce, requirements that entirely depend on or replicate only federal enforcement determinations.

The canon against surplusage, meanwhile, counsels courts to "presume[] that the legislature intended each portion to be given full effect and did not intend any provision to be mere surplusage." *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 327 (4th Cir. 2013) (citation omitted). That canon "is strongest when an interpretation would render superfluous another part of the same statut[e]." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). Here, the

Court's reading gives full effect to the words "in addition to," "more stringent than" or "different from" as they relate to federal requirements contained in the FDCA. Conversely, the Court's failure to give these words effect would permit states to "enforce any law, rule [or] regulation . . . with respect to tobacco products," which would render § 337(a)'s exclusive grant of enforcement authority to the federal government superfluous, lending the canon additional force under the Supreme Court's reasoning in *Marx*. The Court's reading also avoids any conflict with Congress's separate instruction, in § 337(a), that enforcement of the FDCA requirements shall be "by and in the name of the United States" only. *See supra,* Section 1.iv.; *Buckman*, 531 U.S. at 352.

In applying the Court's construction of the FDCA's relevant provisions to Chapter 23.2, the Court must therefore answer two questions: (1) whether the various subsections of Chapter 23.2 impose additional or more stringent requirements than the FDCA or merely seek to enforce FDA standards (which place them outside the ambit of the TCA Savings Clause and render them preempted under § 337(a) and *Buckman*) and (2) if the former is true, whether these additional or more stringent requirements concern sales (which would be permissible under the TCA's Savings Clause) or product standards (which the TCA's Preemption Clause forbids). The Court finds as to (1) that Chapter 23.2 is preempted only to the extent it authorizes state enforcement mechanisms that condition lawful sale or impose penalties based on FDA premarket authorization determinations. The Court further finds that, as to (2), the remaining provisions of Chapter 23.2, which impose requirements in addition to federal law and affect the sale and distribution of tobacco products without establishing product standards, are excluded from preemption by the TCA.

        (ii)     Certain provisions of Chapter 23.2 function solely to enforce FDA authorization decisions and impose no independent, additional state requirements, rendering these provisions outside of the TCA Savings Clause's ambit and thus preempted under § 337 and *Buckman*.

Plaintiffs argue that Virginia's Chapter 23.2 unlawfully enforces the FDA's own standards by "allow[ing] the Commonwealth to make its own determinations about which federal requirements to enforce and to what degree to apply that enforcement, thereby frustrating the Federal Government's goals." (ECF No. 17 at 12.) In Plaintiffs' telling, the premarket authorization requirements under the Virginia statute would not exist without the FDCA's authorization requirements. (*Id.*) As such, by importing the FDCA scheme as a precondition to proceed with enforcement measures, Chapter 23.2 conflicts with "the careful framework Congress adopted" in the FDCA, rendering it preempted under obstacle preemption. (ECF No. 19 at 21) (quoting *Arizona v. United States*, 567 U.S. 387, 402 (2012)).

Defendants, on the other hand, argue that a state's partial reliance on the FDCA in regulating tobacco products does not constitute unlawful enforcement of the federal statute. Defendants cite federal district courts' review of similar statutes in other states for support. (ECF No. 21 at 27) (citing *Casey*, 2025 WL 2582099, at *7; *Wooten*, 2025 WL 1787420, at *5). They further assert that a mere violation of the FDCA does not itself constitute an actionable basis for the Attorney General to initiate enforcement actions under Chapter 23.2. (*Id.* at 29.) Instead, the state may only act against a distributor or retailer who sells e-cigarettes in Virginia that fail to make it into the Attorney General's Directory, further undermining Plaintiffs' preemption argument. (*Id.*;) *see Casey*, 2025 WL 2582099, at *7 (finding that similar state law conditioning certification on FDA premarket authorization was not enforcing the FDCA); *Wooten*, 2025 WL 1787420, at *5 (same).

33

In assessing the disputed provisions of Chapter 23.2, the Court begins by dividing these provisions into three distinct categories: (1) provisions that create administrative or informational mechanisms for vape products, (2) provisions that impose regulatory obligations unrelated to federal authorization standards, and (3) provisions that use state enforcement to condition market access and impose penalties on the basis of federal premarket authorization determinations. Several provisions fall in the first category, because they solely establish administrative mechanisms or recordkeeping requirements, but do not impose any legal consequences on vape producers or retailers based on federal premarket authorization determinations. The Court finds these to include the creation of the Tobacco Retail Enforcement Fund, in § 59.1-293.14; the establishment and maintenance of the Attorney General's Directory in § 59.1-293.15; the certification, disclosure and recordkeeping requirements set forth in § 59.1-293.16(A)–(E); the processes governing removal from the Directory in § 59.1-293.17(A)–(C); and the recordkeeping, audit and inspection requirements provided in § 59.1-293.19(A). These provisions solely collect information regarding manufacturers and products but do not prohibit sales, impose penalties for lack of federal authorization, or otherwise enforce federal premarket authorization requirements.[8]

The second category consists of provisions that solely impose and enforce state-created administrative and recordkeeping obligations. These include § 59.1-293.19(B)–(D), which authorize penalties, audits, inspections and remedial relief in connection with violations of

---

[8]     During argument, Plaintiffs raised concerns that § 59.1-293.16's invocation of federal authorization requirements amounts to enforcement of those same federal standards. The Court finds these provisions to merely require certification, disclosure and reporting based on FDA standards, and therefore to fall into the first category. To the extent, however, that any application of § 59.1-293.16 imposes enforcement measures predicated solely on federal authorization status, such application would fall within the third category.

Chapter 23.2 provisions that do not implicate federal authorization determinations. Although these provisions supply enforcement mechanisms, they do not themselves define unlawful conduct by reference to federal premarket standards and do not enforce the violations of unlawful conduct predicated on federal standards.

Finally, a narrower subset of provisions falls within the third category. These include § 59.1-293.17(D), which sets forth the consequences of failing to meet the requirements for inclusion in the Directory, and § 59.1-293.20(A)–(D), which makes it unlawful to sell or distribute products not listed in the Directory and imposes civil penalties for such sales. These consequences and penalties serve, in essence, to police and enforce vape producers and retailers' compliance with FDA premarket authorization determinations. Section 59.1-293.21, meanwhile, falls in both categories two and three, depending on its application. This provision supplies general enforcement and remedial authority as to all of Chapter 23.2, necessarily covering both provisions in category two (imposing and enforcing state law administrative and recordkeeping obligations) and category three (policing and enforcing compliance with FDA requirements).

These categorical distinctions prove critical to the Court's preemption analysis. Plaintiffs' arguments for preemption rest primarily on Chapter 23.2's integration of FDA requirements into the state enforcement scheme and the way such integration obstructs the FDA's exclusive enforcement grant under § 337(a). These arguments raise significant concerns about the validity of provisions in category three, which enforce the new Directory requirement, and which are predicated entirely on compliance with FDA standards. By contrast, Plaintiffs' preemption arguments — though addressed at Chapter 23.2 in its entirety — do not substantively engage with the provisions in categories one and two, which involve the regulation of tobacco products, but which do not directly implicate any provisions of federal law. The Court first

35

assesses Plaintiffs' arguments for preemption as to the category three provisions, before separately assessing the interaction between the provisions in categories one and two and the FDCA / TCA regime.  As explained more fully below, the Court finds that federal law preempts the former provisions, which directly conflict with § 337(a)'s exclusively federal enforcement regime.  The Court further finds that the TCA's Preservation and Savings Clauses exempt the remainder of Chapter 23.2 from federal preemption, rendering these remaining provisions constitutionally valid.  Finally, to the extent that any application of § 59.1-293.21 or § 59.1-293.16 imposes enforcement measures predicated solely on federal authorization status, such application would fall within the third category and would be preempted.

The Court turns first to the category three enforcement-related provisions of Chapter 23.2.  The Court notes that inclusion in the Attorney General's Directory, and therefore the legality of selling one's vape products in Virginia, depends exclusively on compliance with FDA premarket authorization determinations.  Va. Code § 59.1-293.16(B)–(D).  Chapter 23.2 includes no state regulations involving premarket standards that are "in addition to," "more stringent than," or "different from" the FDA's standards.  In fact, Chapter 23.2 fails to supply independent substantive regulatory requirements at all — compliance with federal premarket requirements is treated as compliance with Virginia law, and failure to comply with federal requirements is treated as a failure to comply with Virginia law.[9]  §§ 59.1-293.17(D), 59.1-293.20.  Put differently, Chapter 23.2's enforcement provisions in §§ 59.1-293.17(D) and 59.1-293.20 are entirely contingent on FDA determinations, leaving no daylight between federal authorization and state legality.  As such, the Preservation Clause of § 387p, which permits states to regulate *in*

---

[9]    During the hearing, counsel for Defendants conceded that these provisions do not impose any substantive requirements beyond those established under federal law.

*addition to* the federal government, simply does not apply to these provisions. Without the Preservation Clause or any other aspect of the TCA amendments to save them, Chapter 23.2's provisions enforcing federal regulations directly conflict with Congress's unequivocal intent, in § 337(a), to grant exclusive enforcement power of the FDCA's rules and regulations to the federal government. Under the federal law of preemption, and as made explicit in *Buckman*, that renders these provisions of Chapter 23.2 preempted.

Defendants argue that, even if these enforcement-related provisions of Chapter 23.2 only serve to enforce federal rules, that still does not constitute a basis for conflict preemption, because these provisions merely regulate conduct that federal law already prohibits, thus creating no "conflict" between state law and federal law. In so arguing, Defendants submit that these provisions fall within a line of cases finding that states can impose "parallel" or "mirror[ed]" federal prohibitions without being impliedly preempted by federal law. (ECF No. 15 at 22–23) (citing *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 334 (5th Cir. 2025). In *Zyla*, a Fifth Circuit case upon which Defendants heavily rely, the plaintiff, a drug manufacturer and seller, sued the defendant, an outsourcing facility, claiming that its sales violated state statutes mirroring the FDCA's approval requirements. *Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 2023 WL 6301651 at *2 (S.D. Tex. Sept. 27, 2023). The defendant argued that, because state laws purportedly required the defendant to seek FDA approval, these statutes were impliedly preempted by the FDCA. *Id.* On appeal, the Fifth Circuit found that states imposing parallel laws do not "somehow conflict with [federal law] by incorporating it." *Zyla Life Scis.*, 134 F.4th at 331. Defendants also cite to the Supreme Court's opinion in *Kansas v. Garcia*, where the Court concluded that federal employment-verification laws do not bar prosecutions under parallel state identity-theft laws. 589 U.S. 191 (2020).

37

Centrally, in considering whether the former impliedly preempt the latter, the Supreme Court

found that "the possibility that federal enforcement priorities might be upset [by enforcement of

a parallel state law provision] is not enough to provide a basis for preemption." *Id.* at 212.

      The Court finds that this line of cases fails to control here, for a few reasons. First, unlike

the statutory schemes at issue in *Zyla* and *Garcia*, the FDCA and TCA together create a

comprehensive scheme specifying *how and by whom* regulations must be enforced. Through

§ 337(a), Congress explicitly reserved FDCA enforcement authority to the federal government,

thereby foreclosing state attempts to create alternative enforcement mechanisms, even under

parallel regulation. Second, Defendants' reliance on *Garcia* is misplaced, because this case does

not turn on whether a state statute upsets "federal enforcement *priorities*," but rather, whether

that state statute contravenes Congress' clear and unmistakable *intent.*[10] *Medtronic,* 518 U.S. at

---

[10]     In *Garcia*, the Supreme Court found that Kansas statutes criminalizing identity theft and engaging in fraud to obtain a benefit were not preempted by the Immigration Reform and Control Act of 1986 ("IRCA"). The defendants argued that IRCA preempted their prosecutions under these statutes, including, as relevant here, on conflict preemption grounds. Specifically, the defendants argued that IRCA provisions governing the verification of an employee's authorization to work in the United States preempted state laws around identity theft and fraud "insofar as they apply to an unauthorized alien's use of false documents on forms submitted for the purpose of securing employment." *Garcia,* 589 U.S. at 203. The "conflict," defendants argued, stemmed from the fact that the Kansas statutes "stand as an obstacle to the accomplishment and execution of the full purposes of IRCA." *Id.* at 211.

     The Court rejected this argument for conflict preemption on primarily three grounds. First, the Court highlighted that many federal and state criminal laws "overlap," and that finding state laws preempted where they merely "overlap to some degree with federal criminal provisions" would "turn[] upside down" the federal system. *Id.* at 211–12. Second, the Court pointed out that there is "no suggestion that the [state] prosecutions frustrated any federal interest." *Id.* at 212. Finally, the Court drew a clear distinction between the "[l]aws of the United States" and the "criminal law enforcement priorities or preferences of federal officers," finding that the possibility that the latter "might be upset is not enough to provide a basis for preemption." *Id.* On this basis, the Court found "no ground for holding that the [state] statutes at issue conflict with federal law." *Id.* at 210.

     Garcia's finding of no conflict preemption, and in particular its language concerning the weight to be given to "enforcement priorities or preferences," are inapposite to this case, for several reasons. As a threshold matter, the Garcia defendants argued for preemption on the basis

485 (finding that "[t]he purpose of Congress is the ultimate touchstone in every pre-emption

case") (internal quotations and citations omitted).  Such purpose is evident here:  Section 337(a)

reflects Congress's unequivocal decision to preclude state enforcement of the FDCA and its

requirements, regardless of whether states enforced these provisions under state laws that mirror

federal standards.

　　　　Further, to the extent that Defendants argue that conflicting enforcement regimes (rather

than conflicting substantive provisions) are inadequate to trigger preemption, that line of

argument is foreclosed by the Supreme Court's opinion in *Arizona v. United States*, 567 U.S. 387

(2012).  There, the Court highlighted that, even though the state statute in question "attempts to

---

of provisions that merely "overlap[ped] to some degree" with the federal statute at issue.  *Id.* at
211.  Here, by contrast, the overlap is total; the federal standards are fully incorporated into the
state provisions, and the latter contain nothing but the federal standards. Va. Code § 59.1-
293.16.  In addition, Kansas authorities were enforcing purely state law provisions in *Garcia*,
not federal laws, while here, Virginia authorities seek to enforce violations of federal FDA
standards.  *Garcia,* 589 U.S. at 208.  Most significantly, however, to the extent that the Supreme
Court found that IRCA even granted federal authorities enforcement discretion over
unauthorized aliens utilizing fake identities to apply for employment, such overall enforcement
discretion was at best implicit, rather than express; the Court refers to "federal enforcement
priorities or preferences" in a general sense, but without attributing them to any textual source.
*Id.* at 212.  In the FDCA, by contrast, Congress expressly included exclusive federal authority to
enforce that statute in § 337(a).  The difference between the IRCA and the FDCA on this point
could not be starker.  While the Court draws a clear distinction between the "[l]aws of the United
States" and the "criminal law enforcement priorities or preferences of federal officers" in the
IRCA context, no such distinction exists in the FDCA context.  *Id.*  Exclusive federal law
enforcement of the FDCA *is* the "law[] of the United States."  Finally, while the Court
highlighted that there was "no suggestion that the Kansas prosecutions frustrated any federal
interests" *in Garcia*, the same cannot be said here.  *Garcia,* 589 U.S. at 212.  Instead, evidence
suggests that the FDA's decision not to enforce some of the vaping regulations at issue here was
motivated, at least in part, by a legitimate federal interest in discouraging consumers from
switching to more harmful tobacco products — an interest that would be entirely frustrated by
enforcement of Chapter 23.2.  (ECF No. 17 at 6.)  For all of these reasons, the Court finds
*Garcia*'s holding, and particularly its statements concerning "enforcement priorities or
preferences" as a basis for rejecting preemption, inapposite to this case and clearly
distinguishable.

achieve one of the same goals as federal law," the statute creates "a conflict in the method of enforcement." *Id.* at 406. The Court found that such a "conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Id.* (quoting *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 287 (1971)). In that context, the Court held that a "state law to the contrary" of Congress's enforcement scheme constitutes "an obstacle to the regulatory system Congress chose," justifying preemption. *Id. Arizona*'s logic applies with equal force in this case, where Congress chose a regulatory system with an exclusively federal enforcement scheme, and where Chapter 23.2's category three provisions create an undeniable "conflict in the method of enforcement," justifying preemption.[11] *Id.*

Moreover, the Court finds Defendants' assertion that Chapter 23.2's enforcement provisions merely "mirror[]" federal law and thus "'recognize[] the supremacy of the national law' by 'conform[ing] to it'" misleading and ultimately incorrect. (ECF No. 21 at 24 (quoting *Zyla Life Scis.,* 134 F.4th at 332);) *see also California v. Zook*, 336 U.S. 725, 735 (1949) ("[T]here is no conflict in terms, and no possibility of such conflict, for the state statute makes federal law its own."). Defendants suggest that these state law provisions "mirror" the FDCA, because they incorporate parallel *substantive* prohibitions. But the statute does not stop there. Critically, Chapter 23.2 imposes enforcement mechanisms that emphatically conflict with § 337(a)'s enforcement directive. By making FDA authorization the operative trigger for *state enforcement*, Virginia is not just adopting the federal substantive standard — it also imposes a separate enforcement authority directly at odds with federal law that expressly reserves such

---

[11]     The Court recognizes that *Arizona* rested on principles of field, rather than obstacle, preemption. 567 U.S. at 406. Nonetheless, the Court finds the Supreme Court's analysis applicable here, because it addresses the same core concern: state laws that intrude upon a federal enforcement framework that Congress intended to be administered exclusively by the federal government.

enforcement authority to the federal government.  In doing so, the enforcement provisions of

Chapter 23.2 neither "mirror" nor "conform to" federal law; rather, they displace the very

enforcement structure that Congress designed and pose an obstacle to the accomplishment and

execution of Congress's intent, triggering preemption under federal law.

The Court's finding stands further supported by the case law.  As discussed above the

First Circuit recognized that state-law claims existing "solely by virtue" of an FDCA violation

are impliedly preempted, because Congress vested enforcement authority only in the federal

government.  *Plourde*, 23 F.4th 29 at 33.  By specifically incorporating 21 U.S.C. § 387j:

*Application for review of certain tobacco products* as the precondition for determining what

products can be sold, any proceeding against a vape manufacturer under Virginia's Chapter 23.2

enforcement provisions would exist "solely by virtue" of that manufacturer's violation of the

FDCA.  As the First Circuit recognized, such state law claims stand preempted by the FDCA and

the federal government's exclusive enforcement authority under § 337(a).

Despite Defendants' argument that *Buckman*'s interpretation of § 337 fails to apply to the

TCA, that case lends powerful support to the Court's finding as well.  According to Defendants,

Congress chose "to include [the Tobacco Act's] Preservation and Savings Clauses as a directive

that States *retain* the authority to enact and enforce additional requirements for the sale of

tobacco products, something the *Buckman* court found was not true for medical devices." (ECF

No. 15 at 23) (citing *Casey*, 2025 WL 2582099, at *8).  As such, Defendants assert that

*Buckman's* interpretation of § 337(a) is "inapposite" to Chapter 23.2, because it did not involve

the TCA and because the Medical Device Amendments at issue in *Buckman* contained no similar

language preserving state authority over such devices.  (ECF No. 21 at 27–28.)  The Court finds

no support for Defendants' position in either the statutory text nor in the case law.  Chapter 23.2

establishes a registration regime using FDA standards for premarket review "as the determinative factor for market access" and permits Virginia to bring enforcement actions for violations of these standards. *IAS&T*, 781 F. Supp. 3d at 739. The Court already found that the Preservation and Savings Clauses of the TCA do not apply to the enforcement provisions of Chapter 23.2. The *Buckman* court, in turn, emphasized that while the FDCA "allow[s] certain state-law causes of actions that parallel federal safety requirements, [the Court's precedent] does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim." *Buckman*, 531 U.S. at 352; *see also Yimam v. Myle Vape, Inc.*, 2020 WL 13614925, at *5 (D.C. Super. Ct. June 11, 2020) (finding that "if the state law claim would not exist in the absence of the FDCA, 'then the plaintiff is effectively suing for a violation of the FDCA (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus impliedly preempted under *Buckman*'") (quoting *Kubicki v. Medtronic, Inc.,* 293 F. Supp. 3d 129, 173 (D.D.C. 2018)). When Congress intends to permit states to enforce provisions of the FDCA, it does so explicitly, as demonstrated by the exceptions enumerated in Section 337(b).[12] No such exception exists for enforcement of the TCA's premarket authorization requirements, strongly suggesting that Congress intended to maintain sole federal enforcement in this domain. Accordingly, the Court finds that the FDA retains exclusive authority to decide how and when to enforce premarket review requirements, including whether and when to take action against products that lack pre-

---

[12]    Section § 337(b) includes the following exceptions:

A State may bring in its own name and within its jurisdiction proceedings for the civil enforcement, or to restrain violations, of section 341, 343(b), 343(c), 343(d), 343(e), 343(f), 343(g), 343(h), 343(i), 343(k), 343(q), or 343(r) of this title if the food that is the subject of the proceedings is located in the State.

21 U.S.C. § 337(b).

market authorization, rendering Defendant's argument undermining *Buckman*'s applicability in this context meritless.

Further, the Court emphasizes that the TCA's inclusion of Preservation and Savings Clauses, without more, does not displace *Buckman*. First, while Defendants correctly highlight that the Medical Devices Act at issue in *Buckman* lacked clauses preserving state authority to regulate disclosures during the FDA's medical device approval process or saving state measures from preemption, the Supreme Court, including in *Buckman* itself, has clearly stated that "neither an express pre-emption provision nor a saving clause 'bars the ordinary working of conflict pre-emption principles.'" *Buckman*, 531 U.S. at 352 (quoting *Geier*, 529 U.S. at 869). Second, Congress placed "new tobacco" regulation within the FDCA, with full awareness of § 337(a), thereby leaving *Buckman* applicable by design. In other words, the TCA's placement within the FDCA evinces Congress' intent for § 337(a) to govern the enforcement structure into which it incorporated tobacco, not the other way around.

The Court also takes note of the Supreme Court's holding in *Heckler v. Chaney*, 470 U.S. 821 (1985), which further supports its findings. In *Heckler*, the Supreme Court recognized "that a [federal] agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." 470 U.S. at 831. The Court emphasized that such discretion includes not only the authority to carry out enforcement actions, but also to decline enforcement altogether. *Id.* at 831–32.

While *Heckler* did not involve questions of preemption, the Court finds it instructive here, because it elucidates the scope of FDA's exclusive enforcement discretion under the FDCA. As other courts have noted, the FDA has "deliberately exercised enforcement discretion" in the tobacco and vape field, adjusting its enforcement policies at least seven times

43

since 2016. *IAS&T*, 781 F. Supp. 3d. at 728, 734.[13]  Such federal exercise of judgment, including decisions not to pursue enforcement against unauthorized products, falls within the discretion that the *Heckler* court found was committed to the federal agency.  470 U.S. at 835. For example, the FDA has recognized that "forcing all unauthorized [vapes] off the market could result in [vape] users reverting to more harmful traditional cigarettes." *IAS&T*, 781 F. Supp. 3d. at 728.  As such, a state statute that converts FDA discretionary decisions into mandatory prohibitions under state law, as is the case with Chapter 23.2's enforcement provisions, impermissibly intrudes into enforcement discretion reserved exclusively to the federal government and thus constitutes an obstacle to the fulfillment of federal law, rendering it preempted under obstacle preemption.

The distinctiveness of the FDCA's federal enforcement scheme and the clear congressional intent to reserve enforcement powers exclusively for the federal government stand well illustrated by contrast to *Northern Virginia Hemp and Agriculture, LLC v. Virginia*, 125 F.4th 472 (2025), the Fourth Circuit's most recent opinion concerning federal preemption of state laws involving health and safety.  There, the court considered a challenge to Virginia's recently enacted Senate Bill 903, which regulates the sale of hemp products.  *Id.* at 483. Plaintiffs challenged S.B. 903's constitutionality on preemption and Dormant Commerce Clause grounds, arguing that it impermissibly imposed more stringent limits on THC in hemp products than those set by Congress in its 2018 Farm Bill.  *Id.*  Writing for a unanimous panel, Judge Quattlebaum affirmed the district court's denial of injunctive relief, finding that plaintiff-appellants failed to establish either preemption or a Dormant Commerce Clause violation.  *Id.* at

---

[13]    Plaintiffs also note that "while many PMTAs are denied, the FDA has continually exercised its discretion not to take regulatory or enforcement action with respect to Small Tobacco vapes because of the potential for overzealous enforcement." (ECF No. 17 at 6.)

484. Concerning express preemption, Judge Quattlebaum highlighted that Plaintiff's argument hinged on a rule of construction included in the Farm Bill's statutory notes, which merely stated that "[n]othing in [the 2018 Farm Bill] prohibits the interstate commerce of hemp or hemp products." *Id.* at 493 (quoting 7 U.S.C. Sec. 1639o, Statutory Notes and Related Subsidiaries). In arguing that this rule of construction demonstrated congressional intent to "creat[e] a nationwide market for hemp" with uniform THC standards, the court found that plaintiffs plainly "overread those statutory notes." *Id.* at 493–94. As to plaintiffs' implied preemption argument, the court characterized this argument as asserting that the state statute's more stringent THC standard "creates a direct conflict between state and federal law and stands as an obstacle to Congress' intent to create a nationwide market for hemp." *Id.* at 495. In rejecting that argument, Judge Quattlebaum highlighted the absence of any evidence, in the statutory text or anywhere else, that Congress possessed such intent in the first place. *Id.* Judge Quattlebaum also emphasized that the statute "expressly permit[s] states to regulate the production of hemp more stringently than federal law," cutting directly against plaintiffs' argument and warranting a finding that the state statute "is not in direct conflict with the purpose of the Farm Bill" and fails to "pose an obstacle to its purposes," therefore warranting rejection of plaintiffs' preemption arguments. *Id.* at 495–96.

Here, the Court confronts a wholly different statute from the one at issue in *Northern Virginia Hemp*, and that contains a decidedly unambiguous statement of Congressional intent. As the Court already outlined, while the FDCA expressly permits state regulation beyond federal standards in certain areas, Congress expressly reserved all enforcement power to the federal government via § 337. Plaintiffs do not conjure up a conflict from a statutory note; rather, they highlight an express statutory provision evincing Congress's unambiguous intent *not*

to have states enforce any aspect of the FDCA.  Further, unlike S.B. 903, which Judge

Quattlebaum found "not in direct conflict with the purpose of the Farm Bill," Chapter 23.2's

enforcement provisions directly conflict with both the text and the purpose of Section 337:  to

grant the federal government unmitigated authority over the enforcement of the FDCA.  The

Court's finding that the FDCA preempts Chapter 23.2's enforcement provisions thus comports

fully with *Northern Virginia Hemp*, where the Fourth Circuit rightfully rejected arguments for

preemption that lacked a clear textual basis or any other support suggesting that the state scheme

conflicted with or constituted an obstacle to the federal scheme.  Here, by contrast, where such a

textual basis clearly exists, and where execution of the proposed state scheme directly

contravenes Congress's intent, a different outcome is required.

     As such, the Court finds that, under the enforcement-related provisions of Chapter 23.2,

Virginia effectively authorizes enforcement actions against manufacturers and retailers based on

whether a product has received FDA premarket authorization, thereby creating a state

enforcement regime that directly conflicts with the exclusive enforcement power vested in the

FDA by Congress under § 337(a).  Such provisions stand as an obstacle to the fulfillment of

federal law and are thus preempted under the FDCA's clear reservation of enforcement authority

to the federal government.

<div style="margin-left: 2em;">

(iii)     Section 387p(a)(1) preserves the remaining provisions of Chapter 23.2 and § 387p(a)(2) does not preempt them, because they relate to tobacco product sales.

</div>

     Having determined that the enforcement related provisions of Chapter 23.2 that condition

market access or impose penalties based on FDA premarket authorization determinations —

namely, §§ 59.1-293.17(D) and 59.1-293.20(A)–(D) — stand preempted by federal law, the

Court turns to the validity of the remaining provisions of the statute.  As explained more fully

below, the Court finds that the provisions fall within the TCA's Preservation Clause (21 U.S.C.

§ 387p(a)(1)) and Savings Clause (21 U.S.C. § 387p(a)(2)(B)), because they impose

requirements "in addition to" federal law and regulate the sale and distribution of tobacco

products within the Commonwealth, but not product standards.  As such, they fall within the

scope of authority expressly preserved to the States by the TCA and are not preempted.

    As already discussed, the tripartite structure of § 387's Preservation, Preemption and

Savings Clauses affords states the ability to regulate the "sale, distribution, possession, . . . or use

of tobacco products" in ways that are "different from, or in addition to" federal requirements, but

does not permit states to impose any such requirement "relating to tobacco product standards,

premarket review, adulteration, misbranding, labeling, registration, [or] good manufacturing

standards." 21 U.S.C. § 387p(a)(1); 387p(a)(2)(A).  By contrast, the TCA's Savings Clause

exempts from the statute's Preemption Clause laws and regulations regarding "the sale . . . or use

of tobacco products" and "information reporting to the State."  § 387p(a)(2)(B).

    As an initial matter, the Court finds that the remaining provisions of Chapter 23.2 fall

comfortably within the Preservation Clause's scope, because they relate to "enact[ing]" or

"enforc[ing] any law, rule, regulation, or other measure with respect to [] tobacco products that is

*in addition to* . . . requirements established" in the TCA."  § 387p(a)(l) (emphasis added).

Nothing in the FDCA or the TCA obligates manufacturers or retailers to comply with state-

maintained directories, state certification regimes, state recordkeeping requirements, or state

inspection programs.  These measures in Chapter 23.2 operate independently of federal

premarket authorization and impose their own additional requirements in the name of tobacco

product regulation.  On that basis, the Court therefore finds that these additional Chapter 23.2

provisions fall squarely within the category of state regulations that Congress expressly preserved for the states.[14]

The Court must still consider, however, whether these provisions stand preempted by the TCA's Preemption Clause, which prohibits state law requirements related to product standards, or whether they fall within the Savings Clause's ambit, which exempts sales regulations from federal preemption. Plaintiffs argue that Chapter 23.2 makes federal authorization the substantive standard for market access, resulting in the Virginia statute necessarily regulating product standards of tobacco products. (ECF No. 19 at 20; ECF No. 17 at 12;) Va. Code § 59.1-293.16(B)–(D). Plaintiffs further assert that while the law, on its face, appears to be a sales regulation, it operates as a state regulatory framework that explicitly makes federal premarket authorization a requirement of lawful sales in Virginia. (ECF No. 19 at 20; ECF No. 17 at 12.) In Plaintiffs' telling, without the FDCA's premarket authorization requirements for vape products, Chapter 23.2 would not exist. (ECF No. 19 at 20); *see also IAS&T*, 781 F. Supp. 3d at 740 (finding that Iowa's similar vape ban law "would be nonsensical without the extensive cross-referencing of federal law"). Thus, Plaintiffs argue that, although framed as sales restrictions, the effect of Chapter 23.2 is to condition market access on federal product standards

---

[14]     For the avoidance of doubt, the Court clarifies that § 59.1-293.14, which establishes the Tobacco Retail Enforcement Fund, is not itself preempted. The Commonwealth may use funds appropriated under that provision to support administration and enforcement of *valid* state-law requirements under Chapter 23.2. However, those funds may not be used to support enforcement actions that this Court has found to be preempted, and thus illegal, including actions that impose penalties or market prohibitions based on FDA premarket authorization determinations.
        The Court further clarifies that § 59.1-293.21 is not independently preempted. That provision supplies general enforcement and remedial authority and operates only in relation to underlying substantive provisions of Chapter 23.2. Its application is therefore limited to the enforcement of provisions that remain valid under federal law and may not be used to seek injunctive or coercive relief for violations of provisions that this Court finds preempted.

determinations, rendering it a law "relating to tobacco product standards" that stands expressly

preempted under the TCA's Preemption Clause.  21 U.S.C. § 387(p)(a)(2)(A).

Defendants argue that such an interpretation "would render the Preservation and Savings

Clauses a nullity" and is thus incorrect.  (ECF No. 21 at 24.)  According to Defendants, "if

Plaintiffs were correct that the Preemption Clause's phrase 'relating to tobacco product

standards' preempts any state regulation of tobacco 'products,' the Preservation and Savings

Clauses would preserve nothing at all."  (ECF No. 23 at 10.)  Consequently, "Plaintiffs'

interpretation is not a plausible reading of the statutory text."  (*Id.*)  The *Casey* court further

found that Congress envisioned "that States use the TCA as a floor for further restrictions on

tobacco product manufacturers from accessing their markets." *Casey*, 2025 WL 2582099, at *5;

*see also R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th at 560 ("the better

understanding [of § 387p] is that Congress intended to allow the federal government the sole

authority to set tobacco product standards, while retaining for states and localities their

longstanding authority to say: 'not here.'").

The Court stands unpersuaded by Plaintiffs' arguments as applied to the remaining

provisions of Chapter 23.2.  Plaintiffs' argument that Chapter 23.2 regulates tobacco product

standards rests on the premise that federal premarket authorization operates as the substantive

determinant of lawful market participation in Virginia.  (ECF No. 19 at 19–21.)  That premise no

longer holds once the PMTA-dependent enforcement provisions — Va. Code §§ 59.1-293.17(D)

and 59.1-293.20(A)–(D) — are set aside.  *See supra* Section C.2(d)(ii).  Without those

provisions, the remaining statutory scheme does not prohibit the sale of any product based on its

federal authorization statute, nor does it impose penalties or market exclusions for failure to

satisfy federal premarket review requirements.  Instead, the remaining provisions regulate the

conditions of sale within the state of Virginia through mechanisms such as registration, certification, recordkeeping, inspection and information reporting. Va. Code §§ 59.1-293.14–16, 59.1-293.19(A). The measures govern who may sell tobacco products, and under what administrative conditions, but they do not prescribe product composition, manufacturing processes, labeling standards or scientific criteria for product approval.

Further, as Defendants correctly note, accepting Plaintiffs' interpretation of the phrase "relating to tobacco product standards" would effectively collapse the distinction that Congress drew between product standards and sales regulations. (ECF No. 23 at 10.) If every state law touching tobacco products were deemed a product-standard regulation simply because it references federal regulatory concepts, the TCA would preserve little, if any, state authority at all. This result stands inconsistent with the statutory text and structure. Congress expressly envisioned that States could continue to regulate the availability and distribution of tobacco products within their borders, so long as States do not impose their own product standards or premarket review requirements. *See Casey*, 2025 WL 2582099, at *7 ("[T]he Preemption Clause was never intended to limit a State[']s[] ability to enact sales restrictions on the sale of tobacco products, regardless of the form they take."); *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th at 553–54 (finding that the "limited exceptions" in the Preemption Clause apply "to the production or marketing stages" of tobacco products.) Once the PMTA-dependent enforcement provisions are severed, the remaining provisions of Chapter 23.2 do not dictate product composition, manufacturing practices, labeling standards or scientific criteria for market entry. Nor do they require manufacturers to restructure their operations to comply with any Virginia-specific product standard. Instead, they regulate the conditions under which tobacco

50

products may be sold in Virginia through traditional mechanisms of registration, reporting and oversight, falling well within the Savings Clause's express reach.

The Court further notes that the remaining provisions of Chapter 23.2 serve important and legitimate state interests that fall squarely within Virginia's traditional police powers. By requiring manufacturers and retailers to submit certifications, maintain records and participate in a state-maintained directory, Virginia can gain visibility into the types of nicotine products being sold within its borders, including the prevalence of flavored products that may pose heightened risks to public health. (ECF No. 15 at 14.) Such information-gathering mechanisms can enable the Commonwealth to monitor market trends, assess youth access and exposure to new tobacco products and evaluate whether future sales restrictions or public-health interventions are warranted. Courts have recognized that States may regulate tobacco sales to protect public health without imposing product standards or altering product composition. *See, e.g., Smokeless Tobacco*, 708 F.3d at 434 (upholding New York City's flavored tobacco ban, because it prohibited sales outright and did not "require manufacturers to alter" the composition of their products or "structure their operations" to qualify under a state-imposed standard.) That authority is particularly salient in the context of vapes, which studies have shown to pose a substantial risk of attracting new users, especially adolescents, through flavored products and targeted marketing. HHS, *E-Cigarette Use Among Youth and Young Adults*, at 5–6, 59–62. The remaining provisions of Chapter 23.2 thus reflect a legitimate effort by Virginia to collect information, oversee local markets, and protect public health, particularly among youth, without intruding into the federally reserved domain of tobacco product standards or premarket review.

* * *

The Court recognizes both Virginia's interest in advancing its citizens' public health through exercises of its traditional police powers as well as the broad police powers states hold in governing tobacco sales. However, states "cannot enforce the FDCA" and therefore may only regulate vape products through "proper exercise of their police powers." *IAS&T*, 781 F. Supp. 3d at 741.[15] Consistent with this framework, the Court refuses to find Chapter 23.2 invalid in its entirety. However, the Court will not countenance Virginia's efforts to use Chapter 23.2 and its Directory requirement as a backdoor mechanism to enforce the FDCA. Thus, to the extent that Chapter 23.2's provisions condition lawful market access or impose state law penalties based directly on FDA premarket authorization determinations, such provisions cross the line from regulating sales to enforcing federal requirements. *Id.* (finding that when the state makes its own judgments about the enforcement of FDA's premarket authorization decisions, it "impermissibly intrudes upon federal enforcement authority and contravenes congressional intent to centralize FDCA enforcement in the federal government.") For this reason, the Court finds Va. Code §§ 59.1-293.17(D) and 59.1-293.20(A)–(D) impliedly preempted by the FDCA and TCA, but finds the remaining provisions preserved as valid exercises of state authority over the sale of tobacco products and not expressly preempted by federal law. Consequently, the Court finds that Plaintiffs have made a clear showing of a likelihood of success on the merits of their federal

---

[15]     Examples of such "proper exercise" of state police powers include New York and California, where legislatures lawfully enacted legislation banning flavored tobacco products, regardless of whether the FDA had authorized or reviewed those products. N.Y.C. Admin. Code § 17–715; Cal. Health & Safety Code § 104559.5(b)(1); *see also Smokeless Tobacco*, 708 F.3d at 434–35 (upholding New York City's ordinance prohibiting flavored tobacco products as a permissible sales restriction rather than a manufacturing standard); *City of Edina*, 60 F.4th at 1173 (finding the City of Edina's straightforward ban on flavored tobacco products lawful).

preemption claim as to those enforcement-related provisions, but not as to the rest of Chapter 23.2.

###    D.    Remaining Preliminary Injunction Factors

####        1.    Irreparable Harm

To obtain preliminary injunctive relief, "[Plaintiffs] must make a 'clear showing' that [they] will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019).  In addition, the alleged harm must be "irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (internal quotation omitted).  "As an initial matter, plaintiffs need not show that every possible modification to their businesses is likely to be unsuccessful to prove irreparable harm." *Casey,* 2025 WL 2582099 at *8 (citing *Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1998) ("[T]he loss of business need not be total, so long as it is so great as to seriously compromise the company's ability to continue in its current form.")); *cf. Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business [because, for example, the product attracted customers who make purchases of other goods while buying the product in question] . . . a preliminary injunction [is] appropriate.")

Here, Plaintiffs have made a clear showing that Chapter 23.2 will materially restrict their ability to operate gainfully and will limit consumers' access to vapor products that they currently lawfully purchase. (ECF No. 17 at 22.)  Plaintiffs' majority shareholder submitted a declaration attesting that the vast majority of Plaintiff Tobacco Hut's revenue arises from the sale of vape products of the kind that would be barred once Chapter 23.2 takes effect. (ECF No. 17-1 ¶ 23.) Plaintiff Nova Distro, in turn, would no longer be able to sell any of its products and would

"have to be closed down entirely." (*Id.* ¶ 14.)  Plaintiffs therefore contend, and the Court agrees, that the statute's enforcement would result in substantial economic harm to their businesses and would necessitate their closure, rising to the level of "irreparable harm" for preliminary injunctive purposes. (*Id.*)

Further, the Court finds that Plaintiffs' harm is exacerbated by the fact that Defendants, as state officers, stand immune from claims for money damages under the doctrine of sovereign immunity. *See, e.g., Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 549 (4th Cir. 2014) (recognizing that "[s]tate officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State."). Thus, enforcement of Chapter 23.2, even if the Court were to declare it unconstitutional at a later date, would immediately inflict actual harm on Plaintiffs that could not "be fully rectified by the final judgment" or any measures taken after the fact. *Mt. Valley Pipeline*, 915 F.3d at 216.  For all of these reasons, the Court finds that Plaintiffs have established a reasonable likelihood that they will suffer irreparable harm if Chapter 23.2 took effect.

### 2.    Balance of Equities and Public Interest

A plaintiff seeking a preliminary injunction must additionally establish "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  When the government is a party in the litigation, as is the case here, the balance-of-harms and public-interest prongs of the preliminary injunction test merge. *Nken*, 556 U.S. at 435. Courts have recognized that when a plaintiff alleges a violation of constitutional rights, the likelihood-of-success inquiry largely drives the balance-of-harms and public-interest analysis. This is because "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the

system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) (internal citations omitted). At the same time, the Court is mindful that states have a substantial interest in the enforcement of their duly enacted laws and that a state may suffer irreparable harm when a valid statute is enjoined. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")

Here, however, the Court has determined that Plaintiffs have demonstrated a likelihood of success on their constitutional claim. Under these circumstances, Virginia's interest in enforcing Chapter 23.2 stands clearly outweighed by the public's interest in preventing the enforcement of a statute that is likely unconstitutional. Accordingly, the balance of harms and the public interest favor preliminary injunctive relief.

### 3. Security Bond

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* Rule 65(c) seeks to "provide a mechanism for reimbursing an enjoined party from harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The Court retains the "discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citing *Hoechst Diafoil,* 174 F.3d at 421). The district court must expressly address the issue of security before allowing any waiver and cannot "disregard the bond requirement altogether." *Id.*

The Court finds that the posting of security is unnecessary under the circumstances of this case. Plaintiffs have shown a strong likelihood of success on a portion of their constitutional claims, and Defendants have not identified any concrete or non-speculative harm that they would suffer if the injunction were later determined to have been issued in error. Accordingly, the Court waives the bond requirement under Federal Rule of Civil Procedure 65(c).

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss (ECF No. 23). The Court will dismiss Count II on sovereign immunity grounds and Count III for failure to state a claim. The Court will DENY the Motion to Dismiss as to Count I.

Further, the Court finds that Plaintiffs have established that that they are likely to succeed on the merits of their federal preemption claim (Count I), that they are likely to suffer irreparable harm without injunctive relief, that the balance of equities tips in their favor and that a public interest exists in granting preliminary relief. Accordingly, the Court will GRANT IN PART and DENY IN PART Plaintiff's Motion for Preliminary Injunction (ECF No. 16). The injunction shall be narrowly tailored to enjoin Defendants only from enforcing Va. Code §§ 59.1-293.17(D) and 59.1-293.20(A)–(D), and any enforcement actions predicated on those provisions, to include such enforcement actions under §§ 59.1-293.16 and 59.1-293.21, while permitting enforcement of all other provisions of Chapter 23.2.

The Court notes that the Fourth Circuit is currently considering an appeal involving a constitutional challenge to a similar North Carolina statute, with oral argument scheduled for January 29, 2026. *Vapor Technology Association v. McKinley Wooten, Jr.*, Docket No. 25-1745 (4th Cir.). As such, the Court will enjoin Defendants' enforcement of the relevant sections of the

Virginia statute until the Fourth Circuit renders a decision in that case.  Once the Fourth Circuit arrives at a conclusion concerning federal preemption relative to the North Carolina statute, the parties may move for further hearing and briefing.

An appropriate order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  December 18, 2025

57